**Ruby Fredricka SHUTTLESWORTH, a minor, by her next friend, F. L. Shuttlesworth; Denise Armstrong, a minor, by her next friend, James Armstrong; Wathaw Avery, a minor, by his next friend, Wathaw Avery, Sr.; and Nathaniel Lee Horton, a minor, by his next friend, Annie L. Horton, Plaintiffs,**

v.

**BIRMINGHAM BOARD OF EDUCATION OF JEFFERSON COUNTY, ALABAMA, Defendant.**

Civ. A. No. 8914.

United States District Court
N. D. Alabama, S. D.
May 9, 1958.

Ernest D. Jackson, Sr., Jacksonville, Fla., and James A. Washington, Washington, D. C., for plaintiffs.

Lange, Simpson, Robinson & Somerville and Reid B. Barnes, Birmingham, Ala., and Cabaniss & Johnston, Thad Holt, Jr., and Jos. F. Johnston, Birmingham, Ala., for defendant.

Before RIVES, Circuit Judge, LYNNE, Chief Judge, and GROOMS, District Judge.

RIVES, Circuit Judge.

Four Negro school children, by their parents and next friends, bring this class action, on behalf of themselves and those similarly situated, to test the constitutionality of the Alabama School Placement Law,[1] and to enjoin the Birmingham Board of Education, its members, agents, representatives and employees from enforcing said School Placement Law, and from refusing, "solely on the basis of race or color or resentment by others," to permit the four plaintiff Negro children and others similarly situated to attend or transfer to a public school situated closer to their respective homes than the schools to which they are now assigned.

The adult and minor plaintiffs are citizens of the State of Alabama, residing in the City of Birmingham. The minor plaintiffs are eligible to attend the public schools of said City. The Birmingham Board of Education is an agency of the State of Alabama and the City of Birmingham charged by law with responsibility for the operation of public schools in said City.

On August 21, 1957, which was two weeks before the beginning of the 1957-58 school term, the adult plaintiffs filed individual petitions with the Birmingham Board of Education requesting "that appropriate and necessary steps be taken to immediately reorganize the school system so as to provide accommodations for our children in schools of the closest proximity to their homes on a nondiscriminatory basis during the 1957–58 term." The Board referred the handling of said petitions to the Superintendent of City Schools, who, on September 9th and 10th, requested the adult petitioners to present their minor children on Monday, September 16th, to the Guidance Center at

---

1. Act No. 201 of the Legislature of Alabama, Regular Session 1955, which became an Act on August 3, 1955, as amended by Act No. 367, Regular Session 1957, which became an Act on August 26, 1957, General Acts of Alabama 1955, p. 492, as amended by General Acts 1957, p. 482.

Thomas School, located in Birmingham, Alabama, for the purpose of taking tests.

Meantime, under date of August 28, 1957, the State Superintendent of Education[2] wrote a letter to the adult plaintiffs, in which he stated:

"I urgently recommend that you fully support your local board of education in its decision in the placement of your child in school. * * As you consider your petition, I ask you to weigh carefully the following:

"1. More people of your race finished high school in Alabama than in any other state in the Union, irrespective of population, even though some other states have more people of your race.

"2. Elementary teachers of your race received higher average annual salaries than the average of the State because of higher training. The teachers of your race in Alabama are better educated than the average of the Nation. Why should you try to take your children away from such highly trained teachers?

"3. A higher percentage of the children of seven to twenty years of age of your race were enrolled in school last year than the State average.

"4. If you have the best conditions in the Nation as set forth in statements 1, 2, and 3 above, why do you want to change the conditions that produced these gains for you and your people?

"5. On August 28, 1956, the people of Alabama voted to change the Constitution of this State, and thereby abolish the right of education or training of any individual at public expense. Under the 1956 Constitutional Amendment [Acts 1956, 1st Sp.Sess., p. 119], any public

school and all public schools can be abolished and the school buildings can be rented or given to individuals to operate private schools. If you refuse to cooperate with the city board of education in the school placement of your children, you will in effect invite the abolishment of the public schools. Where would your children be, and where would the children of your friends and your people be in this State without public schools?

"6. Your child has many advantages in having a teacher of your race.

"7. I think you will destroy what you already have if you refuse to cooperate with the decision of the local board of education to place your child in the school they think will be best for your child.

"8. As your State Superintendent of Education, I ask that you agree with your local board of education in the school placement of your child."

Instead of presenting their minor children for tests on September 16, the adult petitioners, by mail, requested an interview with the Superintendent of City Schools, which he refused and informed them that it would be necessary first to present the minor children for tests as theretofore requested. On October 7, the minor petitioners were presented and given tests under the auspices of the Guidance Center. During the early part of November, their parents were interviewed by the Superintendent of City Schools. Admitted are averments to the effect that petitioners have requested a "final determination of their rights to attend the schools located within the closest proximity of their homes on a nondiscriminatory and a nonracial basis,"

---

2. The plaintiffs do not controvert the averments of the defendant's answer to the effect that:

"* * * the State Superintendent of Education has not been charged by law with any regulation, function, duty or authority with respect to the eligibility or assignment of the minor plaintiffs or with respect to the management or operation of the Birmingham schools in any respect relevant to the issues in this case."

but "the Respondents have not rendered an Opinion admitting or denying the request for assignment of the minor Petitioners to the schools requested * * *." The present complaint was filed in the district court on December 18, 1957.

By motion to dismiss, and by answer filed without waiving its motion to dismiss, the Birmingham Board of Education presents the following defenses:

I. This Court is without jurisdiction.

II. The action is against the State of Alabama, and is prohibited by the Eleventh Amendment to the Constitution of the United States.

III. The plaintiffs have not exhausted their administrative remedies.

IV. The Alabama School Placement Law is not unconstitutional on its face, and the plaintiffs have not stated or proved a case upon which relief can be granted.

The case was submitted for decision upon the motion to dismiss, and for final decree upon the merits. The plaintiffs introduced in evidence their petitions, the correspondence passing between them and the Superintendent of City Schools, and the letter written to them by the State Superintendent of Education, none of which were controverted. The effect of the undisputed evidence has already been stated. The parts of the complaint denied by the defendant are those alleging discrimination against the plaintiffs, which are substantially quoted in the margin.[3] As to such disputed parts of

---

3.
"III

"That in the County of Jefferson and the City of Birmingham, your minor Petitioners, as well as other colored minors similarly situated, are being denied admission to public schools situated and lying within the closest proximity of their homes, respectively, solely because they are not being assigned to public schools other than those they were assigned to, or would have been assigned to prior to the ruling of the Supreme Court of the United States in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and Brown v. Education, May 31, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 653, when said prior assignments to public schools were based almost solely on racial discrimination. This policy of assignment of colored and white pupils to public schools, separated on the basis of race, has been continued and perpetuated since the ruling of the United States Supreme Court in Brown v. Board of Education, Supra, by Legislation passed by the Alabama Legislature declaring as a State policy that:

"'* * * the decision and orders of the Supreme Court of the United States relating to the separation of races in public schools are, as a matter of right, null, void, and of no effect and the Legislature of Alabama declares to all men as a matter of right, this State is not bound thereby.'

"Act No. 42, Special Session, 1956, of the Alabama Legislature, effective February 2, 1956.

* * * * *

"V.

* * * * *

"3. The effect of the above stated provision [Section 2 of Act No. 201] of the Placement Law of Alabama froze the Petitioners in public schools providing for the separation of white and colored pupils irrespective of the nearness of a public school to the Petitioners' respective homes and without any consideration as to the availability of schools facilities.

"4. * * *

"It is obvious that this Alabama Placement Law, being challenged here as to its constitutionality, requires the Board of Education to take into consideration, conditions expressly prohibited as reasons for delaying an early and immediate compliance with the United States Supreme Court's ruling in Brown v. Board of Education, supra, declaring the fundamental principle that racial discrimination in public education is unconstitutional and in the May 31, 1955 Opinion in Brown v. Board of Education, supra, ruling that all provisions of Federal, State or local Law requiring or permitting such discrimination must yield to this principle * * *.

"VI.

"That the Petitioners and those similarly situated are effected adversely and are presently suffering irreparable injury and will continue in the future to suffer irreparable injury by reason of Act No. 201, passed by the Alabama Legislature in its Regular Session in 1955 and became an Act on August 3, 1955 without approval by the Governor requiring local

their complaint, the plaintiffs offer no evidence, but rely entirely upon the judicial knowledge of the Court as to matters of law, the Acts and Resolutions of the Legislature of Alabama, and the history of the period immediately preceding and following the enactment of the Alabama School Placement Law. The ultimate contentions of the plaintiffs are that the Alabama School Placement Law discriminates against them on account of their race or color, and that said law is unconstitutional on its face.

I. Jurisdiction of the Court.

■■ That federal jurisdiction exists in some district court under one or more of the Sections cited in the margin,[4] requires no discussion. The disputed issue of jurisdiction relates to the three-judge court. A substantial federal constitutional question is necessary to invoke the jurisdiction of a three-judge district court under 28 U.S.C.A. § 2281. The Louisiana pupil assignment law was held to be so clearly and patently unconstitutional on its face as not to require the interposition of a three-judge court. Bush v. Orleans Parish School Board, D.C.E.D.La.1956, 138 F.Supp. 336. The Supreme Court denied leave to file a petition for writ of mandamus, 351 U.S. 948, 76 S.Ct. 854, 100 L.Ed. 1472. There, Article 12, Sec. 1 of the Louisiana Constitution, LSA, had been adopted in 1954 making segregation through the exercise of the police power part of the constitutional law of that State. Act 555 of 1954, LSA–R.S. 17:331 et seq. had implemented

that constitutional requirement by providing that: "All public elementary and secondary schools in the State of Louisiana shall be operated separately for white and colored children." The next numbered Act 556 of 1954, LSA–R.S. 17:8.1 was the Louisiana pupil assignment law. Both the three-judge court, 138 F.Supp. 336, and the one-judge district court, 138 F.Supp. 337, 341, thought the pupil assignment law plainly unconstitutional on its face. In affirming the judgment of the one-judge district court, the Court of Appeals for the Fifth Circuit, Orleans Parish School Board v. Bush, 5 Cir., 1957, 242 F.2d 156, 164, said in part:

"Whatever might be the holding as to the validity of an administrative pupil assignment statute containing reasonably certain or ascertainable standards to guide the official conduct of the superintendent of the local school board and to afford the basis for an effective appeal from arbitrary action, Act 556 is not such a statute. The plaintiffs, seeking to assert their right to attend nonsegregated schools as guaranteed them under the Constitution, would be remitted to an administrative official guided by no defined standards in the exercise of his discretion.[8]

"[8] Cf. Carson v. Warlick, 4 Cir., 238 F.2d 724; the North Carolina Pupil Enrollment Act there involved was held by the court to contain adequate standards."

School Boards to carry out a State Policy set forth in said Act and prohibiting their School Boards to act in regards to requests for transfer to schools situated within a closer proximity of their homes relative to the respective Petitioners and others similarly situated without considering an endless list of indefinite factors, a greater portion of which are expressly rejected as an improper consideration for delaying immediate compliance with the United States Supreme Court's ruling in Brown v. Board of Education declaring that racial discrimination in public schools is unconstitutional.
"That the effect upon Local School

Boards in trying to comply with the provisions of said School Placement Law has resulted in the Respondent School Board prohibiting the Petitioners and others similarly situated, from attending the public schools of Birmingham, Alabama on a nonracial discriminating basis in violation of their right secured by the Fourteenth Amendment of the United States Constitution and declared by the Supreme Court of the United States in its Opinion in Brown v. Board of Education, Supra, and other School Segregation cases."

4. 28 U.S.C.A. §§ 1331, 1343 and 42 U.S. C.A. § 1983.

Likewise, the Virginia Pupil Placement Law was held to be so patently unconstitutional on its face as not to call for a three-judge court. Adkins v. School Board of City of Newport News, D.C. E.D.Va.1957, 148 F.Supp. 430, 446. In affirming the judgment in that case, the Court of Appeals for the Fourth Circuit said in part:

" * * * As pointed out by the judge below, * * * this statute furnishes no adequate remedy to plaintiffs because of the fixed and definite policy of the school authorities with respect to segregation and because of the provisions of chapter 68 of the Acts of the Extra Session, which provide for the closing of schools and withdrawal therefrom of state funds upon any departure from this policy in any school. Orleans Parish School Board v. Bush, 5 Cir., 242 F.2d 156, 162, certiorari denied [354 U.S. 921], 77 S.Ct. 1380 [1 L. Ed.2d 1436]." School Board of City of Newport News, Va. v. Atkins, 4 Cir., 1957, 246 F.2d 325, 326–327.

On the other hand, the North Carolina Pupil Enrollment Act was held to contain adequate standards. Carson v. Warlick, 4 Cir., 1956, 238 F.2d 724.

The present plaintiffs requested that a three-judge district court be convened to hear this case. Their able counsel well understood the distinguishing characteristics of a case calling for a three-judge court, and stated upon oral argument:

"* * * We argue two things. One, it might be unconstitutional on its face, it is patently unconstitutional. Two, its constitutionality is doubtful. That is why we asked for a three-judge court because otherwise we would only need a single judge. So it is on two bases, patently on its face and doubtful constitutionality."

That the plaintiffs were well advised in taking the positions that the statute is not so plainly unconstitutional as were the Louisiana Act and the Virginia Act,

and that a three-judge court is necessary, would appear more clearly when we come to discuss the constitutionality of the Act itself. For the present, it is enough to say that we think that a substantial federal constitutional question is presented, and that a three-judge district court has jurisdiction. If we are in error in that view, the judgment to be rendered will, nevertheless, be valid as the act of a district court of one judge, since all three judges concur. Browder v. Gayle, D.C.M.D.Ala.1956, 142 F.Supp. 707, 713, and cases cited in footnote 10, affirmed 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114.

II. Eleventh Amendment.

The contention that the action is against the State of Alabama is precisely analogous to that raised by the Orleans Parish School Board and decided against it in Orleans Parish School Board v. Bush, 5 Cir., 1957, 242 F.2d 156, 160, 161. It is not necessary to repeat what was there said.

III. Exhaustion of Administrative Remedies.

Section 7 of the Alabama School Placement Law provides in part:

"A parent or guardian of a pupil may file in writing with the local Board objections to the assignment of the pupil to a particular school, or may request by petition in writing assignment or transfer to a designated school or to another school to be designated by the Board. Unless a hearing is requested, the Board shall act upon the same within 30 days, stating its conclusion. * *."

The petitions filed with the Board on August 21, 1957, when coupled with the subsequent tests and interviews, all occurring prior to the middle of November, were certainly sufficient to request "in writing assignment or transfer to a designated school or to another school to be designated by the Board." No hearing was requested. The Board had to act, "stating its conclusion," within 30 days. When it did not do so, the plaintiffs had

exhausted their administrative remedies, and were free to seek relief in the courts.

IV. The Merits. Are Plaintiffs Entitled to Relief?

In seeking an injunction on the ground that the Alabama School Placement Law is unconstitutional on its face as contrasted with being unconstitutional in its application, the plaintiffs have assumed a heavy burden indeed. In the first place, for them to have any standing to attack that law, it must be the source of the authority by virtue of which they are prevented from attending the schools of their choice. See Ex parte Bransford, 310 U.S. 354, 361, 60 S.Ct. 947, 84 L.Ed. 1249. The defendant points to the general authority vested in the Board of Education by another statute in effect in Alabama ever since the enactment of the 1927 School Code; providing in part that: "The general administration and supervision of the public schools and educational interests of each city shall be vested in a city board of education * * *." Code of Alabama 1940, Title 52, Sec. 151; see also Section 158 of the same Title. By virtue of its authority to administer and supervise the public schools, the defendant Board might provide for the assignment of pupils to particular schools upon any reasonable and legitimate basis. See 79 C.J.S. Schools and School Districts, § 450. As was said by the writer when speaking as the organ of the Court of Appeals for the Fifth Circuit:

"The equal protection and due process clauses of the fourteenth amendment do not affirmatively command integration, but they do forbid any state action requiring segregation on account of their race or color of children in the public schools. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F. 2d 230, 233. Pupils may, of course, be separated according to their degree of advancement or retardation, their ability to learn, on account of their health, or for any other legitimate reason, but each child is entitled to be treated as an individual without regard to his race or color." Borders v. Rippy, 5 Cir., 1957, 247 F.2d 268, 271.

The defendant Board simply failed either to admit or to deny the request for assignment of the minor plaintiffs to the schools requested, without assigning any reason for such nonaction. Should we proceed on the assumption that it failed to act for some reasonable and legitimate reason permitted by the pre-existing law, or should we hold that its authority is referable to the Alabama School Placement Law, and that its nonaction is based upon some one or more of the grounds specified in that law? The question is not free from difficulty, but under the circumstances of this case, we conclude that the latter alternative furnishes the fairer and sounder answer for several reasons. In the first place, the Board had a duty to act within the 30 days specified by the Placement Law, or promptly in any event, if that law be not regarded. The defendant Board could not better its position by failing to comply with that duty. In the second place, the Board does not in its answer disclaim the Placement Law as the source of its authority, but, to the contrary, stoutly defends the constitutionality of that law. Finally, the Board's agent, the Superintendent of City Schools, in his letter of November 18, 1957 addressed to the plaintiffs' attorney said: "The Board of Education is complying with the provisions of the Alabama laws with reference to the assignment of pupils." The Alabama law having specific reference to the assignment of pupils is the School Placement Law. As we read the Superintendent's letter, it virtually admits that the Board was acting under the authority granted by that law.

Having overcome that hurdle, however, the plaintiffs face the higher obstacle of showing that they cannot attend the schools of their choice because of their race or color, and that such denial of their constitutional rights is brought about by the application of the School Placement Law.

Since the School Segregation Cases,[5] ten states have enacted school placement or pupil assignment laws in various forms.[6] No intellectually honest person would deny that those laws were passed in an effort to meet and solve problems presented by the School Segregation Cases. The Alabama Legislature did not await the decisions themselves, but took notice of the pendency of the cases in the Supreme Court of the United States and in Senate Joint Resolution No. 49, adopted September 21, 1953,[7] appointed an interim committee to prepare

"* * * such legislation, including submission of Constitutional amendments, as may be required to protect the interests of the State and its citizens in the event of a decision by the Supreme Court of the United States which destroys or impairs the principle of separation of the races in the public schools of this State."

Following the decisions in the School Segregation Cases, the interim committee made its report to the regular session of the Alabama Legislature in 1955, Legislative Document No. 1, Regular Session, 1955. Its first proposal included the following:

"1. Amend Section 256 of the Constitution so as to eliminate the express prohibition against the operation of mixed schools, attended by both races; but at the same time make clear that the State will not undertake to coerce anyone to attend mixed schools against his will, and will not be obligated to operate any such mixed schools at all. The amendment would also emphasize as the State's basic educational policy the fostering of education, but only to the extent of the available revenues of the State, and subject to the exercise of its police power to assure harmony and good order as the background for the education of Alabama children.

* * * * * *

"It must be borne in mind that conditions and requirements may vary widely in different counties and school districts. The Legislature should have the greatest possible freedom to provide or authorize the School Boards to provide for the various sections in ways best suited to local conditions, after local authorities have exercised their screening powers to avoid impairment of educational function, social friction and potential disorder inconsistent with the education of youth."

Section 256 of the Alabama Constitution of 1901 had provided in part: "Separate schools shall be provided for white and colored children, and no child of either race shall be permitted to attend a school of the other race." The Amendment eliminating that provision,[8] having

---

5. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884; Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

6. Ala.Acts 1955, No. 201 and 1957, No. 367, General Acts 1955, p. 492, General Acts 1957, p. 482 (Pocket Part, Alabama Code 1940, Tit. 52, Secs. 61(1) et seq.); Ark.Stat.Ann. Secs. 80–1519 to 80–1525 (Supp.1957); Fla.Stat.Ann. § 230.232; LSA–Rev.Stat. Sec. 17:81.1; Miss.Code Ann. Secs. 6334–01 to 6334–08 (Supp. 1956); N.C.Gen.Stat. Secs. 115–176 to 115–179 (Supp.1957), as amended, 1956 Extra Sess.Laws, c. 7, 1 Race Rel.L. Rep. 939 (1956); S.C.Code Secs. 21–230, 21–247 to 21–247.7 (Supp.1957); Tenn. Pub.Acts 1957, c. 13; Tex.Sess.Laws 1957, c. 287, Vernon's Ann.Civ.St. art. 2901a; Va.Code Ann. Secs. 22–232.1 to 22–232.16 (Add.Supp.1956).

7. General Acts of Alabama 1953, p. 1201.

8. "Section 256. It is the policy of the State of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources, and the willingness and ability of the individual student, but nothing in this constitution shall be construed as creating or recognizing any right to education or training at public expense, nor as limiting the authority and duty of the legislature, in furthering or providing for education to require or impose conditions or procedures deemed necessary to the preservation of peace and order.

been submitted by the Legislature, was adopted by the people on August 28, 1956. After the adoption of that amendment, the 1955 School Placement Law, Acts 1955, p. 492, was amended to implement the amended Constitutional provision by repealing various statutes which had re-quired the maintenance of separate schools for the races. Acts 1957, p. 482.

With much force, the plaintiffs' counsel point to the Resolution of Interposition and Nullification passed by the Special Session 1956 of the Alabama Legislature, effective February 2, 1956.[9] While

> "The legislature may by law provide for or authorize the establishment and operation of schools by such persons, agencies or municipalities, at such places, and upon such conditions as it may prescribe, and for the grant or loan of public funds and the lease, sale or donation of real or personal property to or for the benefit of citizens of the state for educational purposes under such circumstances and upon such conditions as it shall prescribe. Real property owned by the state or any municipality shall not be donated for educational purposes except to nonprofit charitable or eleemosynary corporations or associations organized under the laws of the state.
>
> "To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide." Code of Alabama 1957 Supplement, p. 19.

9.      "House Joint Resolution

> "Whereas the Constitution of the United States was formed by the sanction of the several states, given by each in its sovereign capacity; and
>
> "Whereas the states, being the parties to the constitutional compact, it follows of necessity that there can be no tribunal above their authority to decide, in the last resort, whether the compact made by them be violated; and, consequently, they must decide themselves, in the last resort, such questions as may be of sufficient magnitude to require their interposition; and
>
> "Whereas a question of contested power has arisen: The Supreme Court of the United States asserts, for its part, that the states did, in fact, in 1868, upon the adoption of the Fourteenth Amendment, prohibit unto themselves the power to maintain racially separate public institutions; the State of Alabama, for its part, asserts that it and its sister states have never surrendered such rights; and

> "Whereas this assertion upon the part of the Supreme Court of the United States, accompanied by threats of coercion and compulsion against the sovereign states of this Union, constitutes a deliberate, palpable, and dangerous attempt by the court to prohibit to the states certain rights and powers never surrendered by them; and
>
> "Whereas the question of contested power asserted in this resolution is not within the province of the court to determine, but that as in other cases in which one party to a compact asserts an infraction thereof, the judgment of all other equal parties to the compact must be sought to resolve the question; be it
>
> Resolved *By The Legislature of Alabama, Both Houses Thereof Concurring:*
>
> "That until the issue between the State of Alabama and the General Government is decided by the submission to the states, pursuant to Article V of the Constitution, of a suitable constitutional amendment that would declare, in plain and unequivocal language, that the states do surrender their power to maintain public schools and other public facilities on a basis of separation as to race, the Legislature of Alabama declares the decisions and orders of the Supreme Court of the United States relating to separation of races in the public schools are, as a matter of right, null, void, and of no effect; and the Legislature of Alabama declares to all men as a matter of right, this State is not bound to abide thereby; we declare, further, our firm intention to take all appropriate measures honorably and constitutionally available to us, to avoid this illegal encroachment upon our rights, and to urge upon our sister states their prompt and deliberate efforts to check further encroachment by the General Government, through judicial legislation, upon the reserved powers of all states.
>
> "That the Governor is requested to transmit a copy of this resolution to the executive authority of each of the other states, and to the Congress, and to the Supreme Court of the United States for its information.

the concluding sentence of that resolution terms it an "Act", it is in fact no more than a joint resolution and does not have the force and effect of law. See Alabama Constitution of 1901, Sec. 45; In re Doyle, 257 N.Y. 244, 177 N.E. 489, 87 A.L.R. 418, 49 Am.Jur. States, etc., § 36; 81 C.J.S. States § 40; 82 C.J.S. Statutes § 20. It amounted to no more than a protest, an escape valve through which the legislators blew off steam to relieve their tensions. Though defiant in spirit, the intent expressed by that resolution was confined to measures "constitutionally available to us." That resolution came before the adoption of the amendment which eliminated from the State constitution the requirement for segregated public schools. It cannot prevail over that amendment and over the subsequently amended and rewritten School Placement Law. The utmost benefit of the Interposition and Nullification Resolution to the plaintiffs' case is to color the construction of the School Placement Law by its spirit of intransigence. By itself alone, that Resolution is not enough to permit us to declare the School Placement Law unconstitutional.

The plaintiffs would have us conclude without further ado "that the whole intent is to continue the system of separate schools for Negro and white in the State of Alabama." In dealing with an Act of the legislature of a sovereign State, we cannot lightly reach such a conclusion, nor, indeed, are we permitted to do so except upon the most weighty and compelling of reasons.

In testing constitutionality "we cannot undertake a search for motive." [10] "If the State has the power to do an act, its intention or the reason by which it is influenced in doing it cannot be inquired into." Doyle v. Continental Insurance Co., 94 U.S. 535, 541, 24 L.Ed. 148. As there is no one corporate mind of the legislature, there is in reality no single motive. Motives vary from one individual member of the legislature to another. Each member is required to "be bound by Oath or Affirmation to support this Constitution." Constitution of the United States, Article VI, Clause 3. Courts must presume that legislators respect and abide by their oaths of office and that their motives are in support of the Constitution.

If, however, we could assume that the Act was passed by the legislature with an evil and unconstitutional intent, even that would not suffice. As executive officers of the State, the members of the defendant Board are likewise required to "be bound by Oath or Affirmation to support this Constitution." Constitution of the United States, Article VI, Clause 3. No court, without evidence, can possibly presume that the members of the defendant Board will violate their oaths of office.

It is possible for the Act to be applied so as to admit qualified Negro pupils to nonsegregated schools. Upon oral argument, counsel for both sides expressed their understanding that the North Carolina Pupil Enrollment Act was actually being so applied.[11] We cannot say, in advance of its application, that the Ala-

"This resolution became an Act on February 2, 1956 without approval by the Governor." Act No. 42, Special Session 1956 of the Alabama Legislature, p. 70, effective February 2, 1956.

10. Daniel v. Family Sec. Life Ins. Co., 336 U.S. 220, 221, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632, and cases there cited.

11. "Judge Rives: I am under the impression, and I may be wrong. Is it or not a fact that in North Carolina under the replacement [sic] act, some [Negro] children have been placed in theretofore white schools?

"Mr. Johnston: Yes, sir, there have been. I am free to say this to the court. Judge Parker himself told me two days before he died that that was the case. I discussed this with him and he said that there had been one or two cases, several cases around in which arrangements had been made and were acceptable and there had been admissions of some colored people to the schools of North Carolina and this is as good a place as any to say to this court that that is perfectly possible under the laws of Alabama as they are now written. The laws of Alabama were written for the purpose of eliminating from it and from the Constitution the absolute legal prohibition

bama Law will not be properly and constitutionally administered.

The burden assumed by the plaintiffs is not simply to show that some one or more sections or parts of the Alabama School Placement Law are unconstitutional, but that said law is utterly void in toto. That is true because the plaintiffs are not in position to show upon what particular ground they were not permitted to attend the schools of their choice.

The plaintiffs urge that Sections 2, 3, 4, 5, 7 and 8 of the Act are patently unconstitutional. Section 4 sets forth the factors which the Board should consider in determining transfer or continuance of pupils in the public schools. Plaintiffs do not attack each and all of those factors. Instead, their brief states:

"Admittedly, some of these factors may be germane to education and to an enlightened educational system. However, a number are not and have relevancy only in connection with race:

" 'In the assignment, transfer or continuance of pupils among and within the schools or within the classroom and other facilities thereof, the *following* factors and the effect or results thereof shall be considered, with respect to the individual pupil as well as *other* relevant matters; available room and teaching capacity in the various schools; the availability of transportation; the effect of the admission of new pupils upon established or proposed academic programs; the suitability of established curricula for the particular pupil; the adequacy of the pupil's academic preparation for admission to a particular school and curriculum; the scholastic aptitude and relative intelligence or mental energy or ability of the pupil; *the psychological qualification of the pupil for the type of teaching and association involved;* the effect of admission of the pupil upon the academic progress of other students in a particular school or facility thereof; the effect of admission upon prevailing academic standards in a particular school; *the physical effect upon the pupil of attendance at a particular school; the possibility or threat of friction or disorder among pupils or others; the possibility of breaches of the peace or ill-will or economic retaliation within the community;* the home environment of the pupil; *the maintenance or severance of established social and psychological relationships with other pupils and with teachers;* the choice and interest of the pupil, the moral conduct, health and personal standards of the pupil; the request or consent of parents or guardian and the reason assigned therefor.' "

The tests *italicized* are the ones to which the plaintiffs particularly object. Some of the others they conceded upon oral argument, as in good faith they must, to be proper and even desirable.[12]

---

against the operation of integrated schools.

\* \* \* \* \*

"Mr. Washington: \* \* \* I might mention this offhand, one Negro child was placed in a school designated as a White school in Alabama but he was removed three weeks hence because of community pressure and ill will generated by the pressure.

"Judge Rives: What is your understanding of the North Carolina situation?

"Mr. Washington: That it is proceeding in some regions with great rapidity, around the Greenville area and some other areas."

12. "Mr. Jackson: Your Honor, we say some of these particular requirements, that they are logical, because it would amount to a better public school system in Birmingham. For instance, we point out, number one, available room and teaching capacity in the various schools. In the Brown case this was considered to be a legitimate reason for consideration in determining whether the child should be admitted.

"Number two, the availability of transportation facilities. That is conceded to be a proper consideration on the part of the Board.

\* \* \* \* \*

The Act contains a severability provision.[13] In Alabama, such a provision is given full scope and effect.[14] The Supreme Court of Alabama has the last say on the construction of the Act. In advance of such authoritative construction, no federal court can assume that the admittedly proper tests for admission to any public school may not remain the law even though every allegedly improper test and part of the Act may fall for want of constitutionality.

Upon the present record there is no showing but that the exclusion of the plaintiffs from the schools of their choice may be based upon one or more of the admittedly proper tests. For example, no proof was offered as to the available room, the teaching capacity, or the availability of transportation facilities in the schools of plaintiffs' choice. Such proof being totally absent, no court can assume that the plaintiffs can be admitted to the schools of their choice without overtaxing already crowded rooms, classes or school busses.

In the state of this record, we cannot pass separately upon the particular tests and parts of the Act to which the plaintiffs object, for as said in the case of Spector Motor Service v. McLaughlin, 1944, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101:

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality * * * unless such adjudication is unavoidable. And so, as questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law. * * * Avoidance of such guesswork, by holding the litigation in the federal courts until definite determinations on local law are made by the state courts, merely heeds this time-honored canon of constitutional adjudication."

The grounds upon which the Louisiana and Virginia Acts were declared unconstitutional on their face have been heretofore stated at some length. See 162 F. Supp. 376, 377. Enough has also been said to show that none of those grounds are applicable to the Alabama Act. The legal situation in Alabama is more analogous to that in North Carolina, where

"Mr. Jackson: The adequacy of the pupils' academic preparation for admission to a particular school and curriculum. That would be a proper consideration.

*  *  *  *  *

"Mr. Jackson: The choice and interests of the pupil. We believe that choice is important. We don't differ with that. We think a child should have a right to make a choice. That is democratic and in accordance with our system of government.

*  *  *  *  *

"Mr. Jackson: The request or consent of parents or guardian and the reasons assigned therefor. I think that is reasonable."

*  *  *  *  *

"Mr. Washington: * * * It has been admitted that there are certain portions or provisions of article 4, section 4, that are very good. Certainly they are in line with a sound educational policy. I agree with learned counsel when he said that someone walked up and said, 'We ought to have had this long ago.' Certainly we ought to have had this long ago. But section 4 is designed to perpetuate segregation."

13. "Section 14. The provisions of this Act are severable, and if any section or provision of this Act shall be held to be in violation of the Constitution of Alabama or of the United States, such decision shall not affect the validity or enforceability of the remainder of this Act." Act No. 367, Alabama Legislature Regular Session 1957, p. 482.

14. Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810; Opinion of Justices, 247 Ala. 195, 23 So.2d 505; Newton v. City of Tuscaloosa, 251 Ala. 209, 36 So.2d 487.

the Pupil Enrollment Act was ruled to be not unconstitutional on its face in an opinion by the late great Chief Judge Parker, from which we quote:

"Somebody must enroll the pupils in the schools. They cannot enroll themselves; and we can think of no one better qualified to undertake the task than the officials of the schools and the school boards having the schools in charge. It is to be presumed that these will obey the law, observe the standards prescribed by the legislature, and avoid the discrimination on account of race which the Constitution forbids. Not until they have been applied to and have failed to give relief should the courts be asked to interfere in school administration. As said by the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083:

" 'School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles'." Carson v. Warlick, 4 Cir., 1956, 238 F.2d 724, 728.

All that has been said in this present opinion must be limited to the constitutionality of the law *upon its face*. The School Placement Law furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner by the admission of qualified pupils upon a basis of individual merit without regard to their race or color. We must presume that it will be so administered. If not, in some future proceeding it is possible that it may be declared unconstitutional in its application. The responsibility rests primarily upon the local school boards, but ultimately upon all of the people of the State.

The Clerk will enter judgment in favor of the defendant that all relief to the plaintiffs be denied.