Vivian CALHOUN et al.

v.

MEMBERS OF BOARD OF EDUCA-
TION, CITY OF ATLANTA,
GA., et al.

Civ. A. No. 6298.

United States District Court
N. D. Georgia,
Atlanta Division.

June 16, 1959.

On Motion by Defendants to Approve
Plan Dec. 30, 1959.

E. E. Moore, Jr., Atlanta, Ga., Constance Baker Motley and Thurgood Marshall, New York City, A. T. Walden, Donald L. Hollowell, Atlanta, Ga., for plaintiff.

J. C. Savage, Newell Edenfield, B. D. Murphy, Atlanta, Ga., for defendants.

HOOPER, Chief Judge.

### Statement of the Case.

In this action a number of Negro children of Atlanta seek to obtain an injunction against defendants who are in charge of the operation of the Atlanta Public School System "from operating the Public School System of Atlanta on a racially segregated basis and enjoining the defendants from refusing to permit the minor plaintiffs to attend any public school in the City of Atlanta which they are otherwise qualified to attend solely because of their race and color." The plaintiffs do not allege that they have made application for admission to any particular school in Atlanta and have been denied admission solely on account of their race. They do contend, however, that defendants "are presently operating the Public School System of Atlanta on a racially segregated basis pursuant to policy, usage, regulations and laws of the State of Georgia enforcing racial segregation in public institutions (Para. 9)." It is alleged that the next friends of these minor plaintiffs being their parents, have filed between the dates of June, 1955 through September, 1956 written petitions with defendants to reorganize such public schools on a racially non-segregated basis in compliance with the decision of the United States Supreme Court in the case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, but defendants have failed and refused to do so.

Just prior to the trial of the case this Court entered an order to the effect that the Court would take judicial cognizance of the fact that the Public Schools of Atlanta had been operated, and were being operated, on a racially segregated basis. This assumption by the Court was based upon certain acts of the Georgia Legislature preventing the mixing of the races in the schools, the political campaigns of many officials pledging the continuance of segregation, public meetings held in the City of Atlanta debating the question as to whether, should the Court enjoin segregation, the Atlanta Public Schools should be closed and private schools organized, or whether on the other hand, there should be so-called "token integration" similar to that as contemplated by a recent Act of the Legislature

of the State of Alabama, Acts Ala.1955, p. 492, §§ 1 et seq., 14 as amended by Acts 1957, p. 482, which has had the approval of the United States Supreme Court, Shuttlesworth v. Birmingham Bd. of Education, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145.

Counsel for defendants, however, made vigorous objection to this assumption upon the part of the Court and expressed a desire to produce evidence to show that defendants had not pursued a policy of racial discrimination in violation of the principles set down by the United States Supreme Court, by the Fifth Circuit Court of Appeals, and by many other appellate courts in the land. As the burden of proof on that issue rested with the plaintiffs the Court heard evidence on the same from several witnesses, but did not find it necessary to hear from some forty-one witnesses in the court room which were sworn by the parties. Witnesses on the same issue, which would have been cumulative, were not heard. The trial consumed one usual court day, extending from 9:30 A.M. to 4:30 P.M., at the conclusion of which the Court announced its ruling but, on account of the pressure of other trials, has not been able until now to prepare findings of fact, conclusions of law and a final decree.

### The Facts in the Case.

The testimony was undisputed to the effect that plaintiffs are Negro children of the City of Atlanta, attending its public schools, and that such schools are under the control and supervision of defendants. It is undisputed that defendants now provide, and ever since the establishment of the Atlanta School System, have been providing separate schools for white and Negro children, although defendants through their counsel contended that such separation arose through the choice of the Negroes themselves. The sole issue of fact therefore, was whether or not racial discrimination existed in the custom and practice of the operation of the Atlanta Public Schools. The Court finds that the undis-puted evidence in the case demands that this question be answered in the affirmative.

Plaintiffs put upon the witness stand one of the defendants, Dr. Rufus E. Clement, a Negro who had been elected and re-elected by the citizens of Atlanta to the Board of Education. He testified positively that racial discrimination did exist. Miss Ira Jarrell, for some years Superintendent of the Atlanta Public Schools, she being a defendant who was sworn as an adverse witness, testified as to the manner in which school children, Negro and white, were allocated to the various schools. While she did not testify that definite areas surrounding each of the schools were designated for either white or colored, she stated that for the most part children did attend the schools nearer to their residences, but that requests by students and their parents to be allowed to attend other schools were usually granted.

Plaintiffs put in evidence excerpts from the minutes of many meetings of the Board of Education from which it appeared that certain schools of the city were designated as "colored", others as "white." Thus, the minutes of April 11, 1955 showed a recommendation for the election of a certain person as a teacher under the classification "colored, elementary", and two others under the classification "colored". Similar references are made in the minutes of some ten other subsequent meetings, extending almost to the date of the trial. There was also undisputed evidence to the effect that in connection with the issuance of bonds for the building of new schools through many years, designation was made of such schools as "negro" or "white".

If, however, there exists any room for doubt as to racial discrimination prior to 1955, it would be dispelled by the circumstance that during that year and for some years subsequent thereto, the plaintiffs in this case have filed written petitions with defendants seeking the ending of racial discrimination. They were not advised that racial discrimination did not exist, but on the other hand were in-

formed that the matter would be taken under consideration and studied. There the matter has rested for some four years.

### Nature of the Decree to be Rendered.

At the opening of this trial the Court announced that relief would be awarded petitioners similar to that granted by the United States District Court for the Eastern District of Louisiana, which was approved on appeal by the Fifth Circuit Court of Appeals, in the case of Orleans Parish School Board v. Bush, 242 F.2d 156, 157, decided April 5, 1957. In that case approval was given to a judgment of the trial court which enjoined the school authorities "from requiring and permitting segregation of the races in any school under their supervision, from and after such time as may be necessary to make arrangements for admission of children to such schools on a racially non-discriminatory basis with all deliberate speed as required by the decision of the Supreme Court in Brown v. Board of Education of Topeka, 349 U.S. 294 [75 S.Ct. 753, 99 L.Ed. 1083]." In that case, as in this one, it appeared that the plaintiffs "as negro students, were seeking an end to a local school board rule that required segregation of all negro students from all white students." They "were not seeking specific assignment to particular schools." The Court stated:

> "As patrons of the Orleans Parish school system they are undoubtedly entitled to have the district court pass on their right to seek relief."

Even the most ardent segregationists have now acknowledged that the Brown decision is the law of the land. Legislatures in many states, including Georgia, have, since the rendition of that decision, been passing legislation seeking to avoid its consequences. For this Court to declare as law that which is not law would be not only a futile gesture, but a great dis-service to our people. It would add to the confusion already existing in the public mind, it would build up hopes destined to be destroyed on appeal, and it would delay the efforts now being made by our people to find the best solution possible to a critical and urgent problem.

■ This Court is under no duty, nor does it have the power, to order integration, but it is compelled to enjoin racial discrimination. It is not the function of the Court to suggest to defendants how such discrimination can best be eliminated, but the plan must originate with the defendants and be submitted to the Court for approval. Nothing said by the Court during the trial of this case was intended to be an expression of opinion by the Court as to the plan, but the Court did assume, and now assumes, that any plan submitted would contemplate a gradual process, which would contemplate a careful screening of each applicant to determine his or her fitness to enter the school to which application is made. The Supreme Court has said that school authorities must proceed with "deliberate speed" toward the elimination of racial discrimination, and this Court interprets the expression "deliberate speed" to mean such speed as is consistent with the welfare of all our people, with the maintenance of law and order, and with the preservation if possible of our common school system. The custom and practice of maintaining separate schools for Negroes and whites has existed in this state for many years, with the approval of the highest courts of the land, and it cannot rapidly and suddenly be ended.

It will be necessary for defendants within a reasonable time to signify to this Court the manner in which defendants propose to eliminate racial discrimination.

This Court fully recognizes the difficult position in which defendants herein are placed. If they integrate the schools, all State money under existing laws will be cut off and it may be that such funds are necessary for the operation. The continued operation, however, with discrimination as in the past, will not be permitted.

In cases such as this a solution must be found to fit the particular conditions

which exist. This Court feels that it should give defendants a reasonable opportunity to submit to the Court a plan whereby racial discrimination will be discontinued. However, such a plan may be submitted subject to approval thereof by the Georgia Legislature, and the Court would allow sufficient time for the Georgia Legislature to act upon the same. If defendants submit a reasonable plan, and it should be approved by the Court, defendants would have done all that they are able to do under the circumstances. Failure of defendants, however, within a reasonable time to submit any plan whatsoever shall be construed by the Court to be a refusal to do so. The Court will do everything in its power toward working out any possible solution to this matter within the framework of the law, as declared upon repeated occasions by our appellate courts. Counsel for plaintiffs shall submit to this Court a decree in conformity herewith, serving defense counsel, who shall within ten days of such service notify this Court of any objections thereto.

### Order on Motion by Defendants to Approve Plan.

Pursuant to order of this Court dated January 6, 1959 defendants, as members of the Atlanta Board of Education, have submitted to the Court a Plan under which they propose to operate the Atlanta Public Schools without any discrimination as to race or color. The Court issued a rule nisi, plaintiffs filed their objections to the Plan, and the matter came on for hearing on December 14, 1959.

Defendants promptly complied with the order of Court in preparing and submitting their Plan, but cite no authorities in support of the same. Plaintiffs' counsel have cited to the Court a few decisions which bear upon the question. As the Plan must be passed upon by the Court prior to convening of the Georgia Legislature and court calendars are already set up covering the intervening period it has been necessary for the Court over the Christmas Holidays to give as much study to the matter as possible.

The Court has been greatly assisted in this matter by an article by Professor Daniel J. Meador, Assistant Professor of Law at the University of Virginia, appearing in the Virginia Law Review of May, 1959 beginning at page 517, which reviews many cases and statutes bearing upon the questions here involved and many of the cases cited below were obtained by the Court from that article. Should the Court find it necessary this opinion will be supplemented or revised at a later date.

### The Plan Submitted.

As introductory to the Plan itself the resolution adopting the same states certain pertinent facts confronting the Atlantic Board of Education, and these facts not being refuted by the plaintiffs are taken to be true. Among other things a recital is made that the Board is faced with the task of educating 116,000 pupils, of which approximately forty per cent, or some 46,400 are Negroes; that there is at this time a rapid influx of children of school age into the City, that these children vary in achievement and ability; that there is at present a shortage of some 580 classrooms, many classes are held in churches and other buildings, and many have double sessions. Other problems confront the Board brought about by slum clearances and changes in residential patterns in various communities.

The foregoing facts are stated by the Court to illustrate the problems confronting the defendant Board of Education. The Plan abolishes segregation beginning at the twelfth grade, and each year takes in a lower grade until all grades in all schools are included, and should all or a large part of 46,400 Negro children apply for assignment at one time, it would of course put an intolerable burden upon the School Board to process their applications and make readjustments in all classes and in all schools. That fact must have been in the mind of the defendants when they proposed commencing the Plan with only the twelfth grade.

Also, it is recognized that where such a Plan begins with the first grade and extends to the higher grades there is a greater problem as to adequate housing, and a greater degree of disruption in initiating the Plan.

Essentially the Plan contemplates that all pupils in the schools shall, until and unless transferred to some other school, remain where they are, all new and beginning students being assigned by the Superintendent or his authority to a school selected by observance of certain standards as set forth in the proposed Plan.

Included in the objections to the Plan offered as a whole are these:

That the Plan is not complete, that it "avoids the duty imposed on defendants to desegregate," that the inherent delays embodied in the plan makes a prompt and reasonable start impossible; that defendants do not show that additional time is necessary, that two of the factors for transfer of placement are constitutionally irrelevant and that the criteria upon which the Plan proceeds is too vague and indefinite. It is also attacked upon the ground that it is made contingent upon passage of statutes by the Georgia General Assembly.

As many of these objections are similar they will be discussed under the several headings set forth below:

(1) The objection to the Plan that it allegedly "avoids the duty imposed on defendants to desegregate," is an objection heretofore frequently considered by the courts and uniformly rejected.

The real essence of this objection stems from the fact that in urban areas the public schools are frequently located in the midst of large residential areas, either Negro or white, and, when pupils are assigned to the school nearest to their homes and therefore reached by them more safely and easily, the result is that the school will naturally, without any racial discrimination, be composed practically without exception of only white or Negro pupils.

The above result, however, where it pertains, is not necessarily brought about on account of racial discrimination, but on account of geography and residential patterns.

In the case of Borders v. Rippy, 247 F.2d 268, at page 271, the Fifth Circuit Court of Appeals speaking through Judge Rives (now Chief Judge of that Circuit) wrote as follows:

"The equal protection and due process clauses of the fourteenth amendment do not affirmatively command integration, but they do forbid any state action requiring segregation on account of their race or color of children in the public schools. Avery v. Wichita Falls Independent School District, 5 Cir., 1957, 241 F.2d 230, 233. Pupils may, of course, be separated according to their degree of advancement or retardation, their ability to learn, on account of their health, or for any other legitimate reason, but each child is entitled to be treated as an individual without regard to his race or color."

The case just cited was subsequently cited with approval by the same court, in Holland v. Board of Public Instruction, 5 Cir., 258 F.2d 730. It is the law in this Circuit and is binding upon this Court.

The same principle of law has been followed in other cases.

In Avery v. Wichita Falls Independent School District, 5 Cir., 241 F.2d 230, 233, the court cited with authority the opinion of a district court which held, with reference to the case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, that the Supreme Court

" * * * has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, * * * is that a state may not deny to any person on ac-

count of race the right to attend any school that it maintains * * * if the schools which it [the State] maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action."

In a subsequent case, Rippy v. Borders, 5 Cir., 250 F.2d 690, the Court again announced its adherence to the foregoing principles.

In the Fourth Circuit in the case of Thompson v. County School Board of Arlington County, D.C., 144 F.Supp. 239, Judge Bryan wrote as follows:

"It must be remembered that the decisions of the Supreme Court of the United States in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, do not compel the mixing of the different races in the public schools. No general reshuffling of the pupils in any school system has been commanded. The order of that Court is simply that no child shall be denied admission to a school on the basis of race or color. * * * Consequently, compliance with that ruling may well not necessitate such extensive changes in the school system as some anticipate."

The above decision was affirmed by the Court of Appeals of the Fourth Circuit, 252 F.2d 929 and certiorari to the United States Supreme Court was denied, 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1065. See School Board of City of Charlottesville, Virginia et al. v. Allen, et al., 240 F.2d p. 59.

■ The Plan of the Atlanta School Board therefore, is not invalid merely because it prohibits racial discrimination rather than requiring a mixing of the races.

(2) Objection is made to the proposed Plan on the ground of "the inherent delays embodied in the Plan."

Plaintiffs' counsel insist that the Plan in question does not meet the requirements laid down by the Supreme Court. They cite the case of Cooper v. Aaron, 358 U.S. 1, at page 7, 78 S.Ct. 1401, at page 1404, 3 L.Ed.2d 5, where the Supreme Court pointed out that:

"delay in any guise in order to deny the constitutional rights of negro children could not be countenanced, and that only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools could constitute good faith compliance."

There is no complaint that the processes of the Court have not moved with suitable speed. As a matter of fact, the order requiring a Plan to be submitted was entered within less than two years from the date of the filing of the suit. The charge of delay is based upon the contention that a period of twelve years is required for the completion of the elimination of desegration in all of the classes in all of the schools.

■ Counsel for plaintiffs do not cite any cases holding that, where a prompt start is made, it can be said not to be diligently and earnestly pursued because it requires a total period of twelve years. Suffice it to say that since rendition of the Brown decision a number of school boards have established plans, some beginning at the first grade and extending through the higher grades, others beginning at the higher grades and extending through the first grades, and as far as this Court knows, none of such plans have been rejected upon the basis that they do not move with sufficient speed. A number of these plans are contained in cases which are hereinafter cited.

(3) A general review of the measures taken in many southern states and border states since the rendition of the Brown decision, both by way of legislative enactments and by way of plans adopted without legislative action, show that the so-called Pupil Placement Plan (also referred to as Pupil Assignment Plans, Enrollment Plans, etc.) have been adopted in one form or another in many states, including Virginia,[1] North Carolina, Alabama, Louisiana, South Carolina, Florida, and Tennessee. In some of these states the plans were adopted soon after the Brown decision, although there was at the time of the adoption of the same, no litigation pending nor any action being taken toward the elimination of racial discrimination. The plans were no doubt adopted against the day when such efforts would be made and they were adopted in full recognition of the fact that the people of the states adopting them had no desire to abolish segregation, but considered it wise to make plans for the future against the day when segregation in such states might be enjoined by the courts. Mississippi was one of the first states to adopt such legislation, though as yet there have been no efforts to abolish segregation in that state.

It appears also the Pupil Placement Plans have been of force in various parts of the country for many years before the matter of racial discrimination became an issue.

■ It is now well established that school authorities have the inherent power to exercise their own discretion as to the assignment of pupils to various schools within their respective systems so long as their discretion is exercised in good faith and discrimination does not exist.

It therefore appears clearly that the Plan submitted by defendants is within the power of the defendant School Board to establish unless subject to one or more of the defects charged against it.

■ (4) Plaintiffs insist that "two of the factors which the Plan refuse consideration of are constitutionally irrelevant and may not be applied in this case," these factors being the following:

(1) The possibility of threat of friction or disorder among pupils or others, and

(2) The possibility of breaches of the peace or ill will, or economic retaliation within the community.

In the case of Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, the School Board in Little Rock sought a postponement of their program for desegregation "because of extreme public hostility." The trial judge found as a fact that there were "repeated incidents of more or less serious violence directed against negro students and their property" (see 358 U.S. at page 13, 78 S.Ct. at page 1407). The Supreme Court held that the foregoing facts did not justify a postponement of the plan of desegregation, stating that however desirable the preservation of the public peace may be it "cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution." See 358 U.S. at page 16, 78 S.Ct. at page 1409.

It therefore follows that the two considerations quoted above cannot validly be considered by the Board of Education where such factors pertain only to race or color. Whether these factors might be material under facts not involving race or color need not now be determined. That is to say, whether or not the personal traits of a pupil, regardless of race or color, might create a possibility of threat of friction or breach of peace is another question.

1. The legislative history of Virginia's first Pupil Placement Law, Acts Va.1956, Ex. Sess., c. 70, § 1 et seq. which was held invalid is contained in Adkins v. School Board, D.C., 148 F.Supp. 430, decided January 11, 1957. Subsequent legislation in Virginia upon this question and various local plans therein established based upon the inherent power of the school authorities, are not discussed in this opinion.

■ (5) Plaintiffs' counsel contend that the following standards are too vague and indefinite, to wit:

"(1) the psychological qualification of the pupil for the type of teaching and associations involved (Paragraph 1).

"(2) the psychological effect upon the pupil of attendance at a particular school (Id.).

"(3) the home environment of the pupil (Id.).

"(4) the maintenance or severance of established social and psychological relationships with other pupils and with teachers (Id.).

"(5) the ability to accept or conform to new and different educational environment (Id.).

"(6) the morals, conduct, health and personal standards of the pupil (Id.)."

It is true that "psychological qualifications" and "psychological effect" are broad and general terms. Psychology covers a vast field. "Psychological test" has been defined as "any method used for measuring an individual's mental characteristics, as memory, intelligence, emotionality, intelligence or speed of reaction." See Webster's New International Dictionary, 2nd Ed. Certainly the foregoing factors would be relevant and material in Pupil Placement and there is no reason why they should be applied in a discriminatory way. The fact that the language is general does not mean that it can be made to encompass a test which would not be valid.

Should the defendant Superintendent of Schools interpret such factors in a way that would be discriminatory the pupil involved would have the right of review. A finding against a pupil based upon psychological tests should be sufficiently definite so that the ruling upon review could be understood.

Indeed the Supreme Court in deciding the case of Brown et al. v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, based its decision in part upon the psychological effect which certain practices may have upon the students involved.

■ (6) Plaintiffs also contend in their brief that the Plan in question is not proposed in good faith and will be violated. This same contention was urged in the case of Shuttlesworth v. Birmingham Board of Education, D.C., 162 F. Supp. 372, 381, but was rejected by a three-judge court whose judgment was affirmed, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145. The trial court after stating that they could not in testing the constitutionality undertake a search for motive stated the following:

"If, however, we could assume that the Act was passed by the legislature with an evil and unconstitutional intent, even that would not suffice. As executive officers of the State, the members of the defendant Board are likewise required to 'be bound by Oath or Affirmation to support this Constitution.' * * * No court, without evidence can possibly presume that members of the defendant Board [of Education] will violate their oaths of office."

The objection is not well taken.

■ (7) Plaintiffs object to the administrative procedure set forth in the Plan whereby a pupil might have a review of the rejection of his application for placement or transfer. In plaintiff's brief it is stated:

"The Plan fails to set a period of time within which the Superintendent of the Board must act upon an application for assignment or transfer."

This objection is well taken. Following is an outline of the Plan in so far as it regards administrative appeal:

Under the schedule contained in the Plan for the administrative consideration of these applications, it would be difficult if not impossible, for an application filed on June 15th to be completely processed by September 1st for this reason: Upon filing of application for transfer on or before June 15th, the Board is required to "act upon the same within a reasonable

time" (Paragraph 8 of the Plan). If a hearing is requested by the applicant or held by the Board, five days notice shall be given to the parents or guardian and "the hearing will be begun within thirty days from the receipt by the Board of the request" (Paragraph 8 of the Plan). A hearing may be conducted by the Board itself, in which event it could probably make a prompt decision. However, it is provided said hearing may be had before not less than three of its members, or before competent examiners, which shall report to the Board and "no final order shall be entered in said case until each member of the Board of Education has considered the entire record." The Board will notify applicant of its position "within twenty days after the conclusion of the hearing." Exceptions to the decision made by the Board may be filed within five days of notice of the Board's decision, and the Board shall meet within fifteen days of the receipt of the exceptions to consider the same.

The foregoing would consume a period of time in excess of seventy-five days, and only seventy-five days elapse between June 15th and September 1st. Furthermore, endless delay could be caused by the provision that no final order would be entered before each member of the Board of Education should consider the entire record, nor does it appear certain that some member will not be hindered in some way from considering the entire record.

The Plan further provides that "any person dissatisfied with the final decision of the Board may appeal to the State Board of Education as provided by law." To that end there was introduced in evidence (Plaintiffs' Exhibit No. 1) a booklet entitled "Georgia School Laws", Part XXXVI pertaining to procedure in cases on appeal to the State Board of Education. However, that portion of the school laws pertains to appeal in "all controversies heard by a county board of education" and this case involves a city board of education.

As the defendant school board has merely submitted its plan because the Court ordered it to do so, and is making no effort to sell the Plan to the Court, various aspects of the matter are left open. The Plan, however, will have to be changed in so far as the procedure in regard to applications for transfer are concerned, so as to insure a hearing upon such applications promptly following June 15th of each year, and a final administrative decision on the same on or before September 1st of each year. Explanation should also be made in connection therewith as to what is meant by "appeal to the State Board of Education," particularly since the latter party is not a party to this case and cannot be compelled by this Court to make a ruling upon such appeal.

Counsel for defendants stated at the hearing that defendants would be willing to amend this Plan, and defendants are therefore directed to file an amendment to the same with this Court in the regards above specified on or before January 6, 1960, serving opposing counsel with a copy of the amendment immediately upon its completion, and plaintiffs may file written objections thereto within five days thereafter, and the Court will then make a ruling upon any objections then pending.

There are several decisions which go into the matter of validity of standards which school authorities may adopt as to Pupil Placement and Assignment, same being discussed in Shuttlesworth v. Birmingham Board of Education, D.C., 162 F.Supp. 372. There a three-judge court upheld the Alabama statute and its decision was affirmed by the United States Supreme Court (358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145).

The trial court pointed out that Pupil Placement Laws had been enacted in ten states (see 162 F.Supp. at page 379, headnote 6). Attention was called to the fact that statutes in Louisiana and Virginia had been held void, pointing out also that the Alabama law was more similar to a statute of North Carolina which had been held valid in Carson v. Warlick, 4 Cir., 238 F.2d 724, certiorari de-

nied 353 U.S. 910, 77 S.Ct. 665, 1 L.Ed.2d 664. This Court assumes that all of the standards set forth in the proposed Plan not herein attacked are conceded to be valid.

Able counsel for plaintiffs place great emphasis on the case of Gibson v. Board of Public Instruction of Dade County, Florida et al., 272 F.2d 763, 765 by the Fifth Circuit Court of Appeals. This Court interprets that case as holding that the Pupil Assignment Law involved therein did not meet the requirements of law primarily for the reason that after its adoption,

> "no notice or advice from the Board or Superintendent was given to the children and their parents * * * to the effect that negro children * * * were not permitted to have considered fairly their choice of a school"

and upon the further ground that after adoption of the Plan the school authorities continued to designate the schools separately according to races. That case does not seem to be controlling upon the case at Bar.

 (8) It is contended "the Plan cannot be made contingent upon the enactment of statutes by the General Assembly of Georgia permitting the same to be put into operation." As to the above objection at the time of the hearing on December 14th the Court sought to make full explanation concerning the provisions in the order of this Court entered July 9, 1959 that defendants might submit a plan contingent upon its approval by the Georgia Legislature.

At the risk of repetition the Court now states that the existence of certain Georgia statutes would mean that the mixing of races in any school of the Atlanta School System would mean that all financial aid to the same from the State would be cut off, and apparently without the aid of funds from the State the Atlanta School System could not operate, as a great portion of the finances for Georgia schools is derived from the State.

For the Court to order the Atlanta Public Schools to desegregate would be equivalent therefore to ordering them to close. Since the Legislature meets in January, 1960 and the next school term begins in September, 1960, there is therefore no delay caused by making the Plan contingent upon the passage of legislation which will permit the Atlanta schools to carry through their plan without punitive action on the part of the State.

As then stated by the Court, it was and is, the feeling of the Court that the people of Georgia through their chosen representatives in the Legislature should be allowed to make the important decision as to whether they would prefer the closing of their schools on one hand, to the gradual desegregation of the schools on the other hand, pursuant to the Plan under consideration.

 (9) To guard against the contingency that certain portions of the proposed Plan might hereafter be held invalid by the courts for any reason, the Plan should contain a severability provision so that the elimination of any invalid test or standard would not cause the entire Plan to fall. Compare Shuttlesworth v. Birmingham Board of Education, D.C., 162 F.Supp. at page 372(7).

(10) By way of summary the rulings now made by the Court are as follows:

(a) The Plan submitted by the Board of Education must be amended on or before January 6, 1960 to provide for more expeditious administrative procedure (see Paragraph 7 above).

(b) The Plan must be amended so as to contain a severability provision (see Paragraph 9 above).

(c) Standards referred to in Paragraphs 4 and 5 above, relating to contemplated friction or breaches of the peace, shall be taken to contemplate factors other than racial discrimination. Factors concerning "economic retaliation" must be stricken from the Plan (see Paragraph 4 above).

(d) Standards involving psychological factors must be applied without reference

to race or color, placements based upon the same must specifically designate the facts upon which the findings are made.

(11) Counsel for all parties have the right to move for amendment to this order based upon any misstatement of facts that might be contained therein. Further order of the Court will be made on or after January 6th next when amendment to the Plan is offered by defendants.