HOUSTON, Justice
(concurring ■ specially).
I concur.
If the State of Alabama had requested that this Court set aside the Liability Order in this litigation, I would have voted to do so for the following reasons.
Alabama Code 1975, § 12-2-13, provides:
“The Supreme Court, in deciding each case when there is a conflict between its existing opinion and any former ruling in the case, must be governed by what, in its opinion, at that time is law, without any regard to such former ruling on the law by it .... ”
(Emphasis added.)
In Ex parte James, 713 So.2d 869, 878 (Ala.1997), Justice Cook summarized what is established law:
“ ‘[T]he lack of subject matter jurisdiction is not waivable and may be raised at any time by the suggestion of a party or by a court ex mero motu.’ Judgments entered without subject-matter jurisdiction can ‘be set aside at any time as- void, either on direct or on collateral attack.’ ”
(Citations omitted; emphasis added.)
My opinion now, as it was in 1995[7] and in 1997,[8] is that the Liability Order was wrongly decided, and that § 256 of Amendment No. Ill of the Constitution of Alabama of 1901 (hereinafter “Amendment 111”) was a duly ratified constitutional amendment that does not violate the Fourteenth Amendment to the Constitution of the United States. My opinion now differs from my opinion in 1995 and 1997, because now I believe that the trial court was without subject-matter jurisdiction to decide the liability issue. See Part I of this special writing.
I raise this issue in this special writing, because I think I have an obligation to do so. A trial judge elected by the majority of the voters in a single Alabama judicial circuit has declared a portion of the Alabama Constitution unconstitutional.[9] My research has failed to reveal that this has ever been done before. I, and all Alabama judges and Justices, have taken an oath to “support ... the Constitution of the State of Alabama....” Ala. Const.1901, Art. XVI, § 279. “Support, uphold, back, advocate, champion. These verbs mean to give aid or encouragement to a person or a cause. Support is the most general.” The American Heritage Dictionary of the English Language 1739 (4th ed.2000) (emphasis in original).
I am a great admirer of Judge Learned Hand. I try to be guided by Judge Hand’s speech given at the “I Am an American Day” in Central Park in New York City, *821 on May 21, 1944. In that speech he said: “The spirit of liberty is the spirit which is not too sure that it is right. ...” Gerald Gunther, Learned Hand: The Man and the Judge 549 (Alfred A. Knopf 1994). Therefore, I go beyond Amendment 111, where I think that I am right, to a point where I am sure that I am right.
My opinion now is that even if Amendment 111 violated the Fourteenth Amendment, and that this violation revitalized the original § 256 of the Alabama Constitution of 1901 (hereinafter the “original § 256”) (which I do not believe that it did' — see Part II below), there is no way the second sentence of the original § 256 violated the Fourteenth Amendment. This sentence provided: “The public school fund shall be apportioned to the several counties in proportion to the number of school children of school age [between 7 and 21] therein .... ” (Emphasis added.) The trial court does not explain how this sentence — which requires equal payment for the education of each Alabama child regardless of race, color, creed, gender, citizenship, or national origin — violates the Equal Protection Clause of the Fourteenth Amendment; it merely declares that it does: “The second ... sentence[] [is] declared to be without force or effect under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.” How can a constitutional provision that requires that school funds be spent equally for each school child in Alabama be a violation of the Equal Protection Clause? See Part III of this special writing.
However, because the majority of this Court is now doing what I said had to be done in my special writing concurring in the result in part and dissenting in part in Ex parte James, supra, I am merely raising my concerns about the lack of subject-matter jurisdiction of the trial court as to all or part of the Liability Order, and I am concurring with the majority of this Court in dismissing these cases.
In Ex parte James, 713 So.2d at 895, I wrote:
“I concur to remand for the trial court to vacate its judgment insofar as it concerns the Remedy Plan.... A trial court has declared the Alabama educational system unconstitutional. Circumstances have denied this Court the opportunity to review the trial court’s liability order. Even so, it is the duty of the Judicial Department of Alabama government only to determine what the Constitution of Alabama requires. In my opinion, the Legislative Department and the Executive Department, and not the Judicial Department, have the power and duty to implement a plan that would make this system equitable (and hence, according to the trial court’s liability order, constitutional). I trust that the Legislative Department and the Executive Department will proceed to exercise the power and perform the duty they have been called upon to exercise and perform to make Alabama’s public educational system constitutional. The ‘Separation of Powers’ provision of the Constitution of Alabama of 1901 (Art. Ill, § IS) prohibits me from doing more, without resorting to unconstitutional judicial activism, which I have heretofore avoided.”
(Houston, J., concurring in the result in part and dissenting in part.) (Second emphasis added.)
It is not that I do not personally agree with what has been attempted — I do. In my heart and mind, I believe all Alabama children deserve an adequate education. Judge Hand concluded his “Spirit of Liberty” speech with the following: “[T]he spirit of liberty is the spirit of Him who, near two thousand years ago, taught mankind that lesson it has never learned, but has never quite forgotten; that there may be a *822 kingdom where the least shall be heard and considered side by side with the greatest.” Gunther at 549. It is just that I cannot judicially agree with what has been done, and I am writing as Justice J. Gorman Houston, Jr., not as citizen J. Gorman Houston, Jr. The Constitution is the command of “We the people of Alabama,” [10] and it inhibits Justices and judges. If, as in the New Jersey Constitution, the Alabama Constitution assured its citizens of “a thorough and efficient system of free public schools,” and if there were no separation-of-powers provision in the Alabama Constitution, then perhaps I could reach judicially the results reached in some of the decisions that led to Abbott v. Burke, 153 N.J. 480, 710 A.2d 450 (1998), which the New York Times declared “may be the most significant education case since the Supreme Court’s desegregation ruling nearly 50 years ago.” A Truce in New Jersey’s School War, N.Y. Times, Feb. 9, 2002, at A18. However, judicially I cannot take the language that pertains to education in the Alabama Constitution, originally or as amended, and hold that it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. That fact combined with the strong separation-of-powers provision in the Alabama Constitution [11] prohibits me from attempting to exercise legislative and/or executive powers to fix education in Alabama.
I.
Simply put, I believe (1) that the trial court was and is without subject-matter jurisdiction to rule on the parties’ challenge to Amendment 111; (2) that the trial court’s lack of subject-matter jurisdiction leaves the Equity Funding Case with no foundation; and (3) that Amendment 111 remains part of the Constitution of Alabama and empowers the Alabama Legislature to enact all, part, or none of the plaintiffs’ proposed educational reform.
Both complaints in the Equity Funding Case list as their “First Claim” what in fact serves as the foundation and essential first step of these cases: a requested declaration that Amendment 111 is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment, so that educational reform can be accomplished by judicial fíat and not by legislative will. Education is not listed as a right in the Declaration of Rights in the Alabama Constitution of 1901 (Art. I, §§ 1-36). Additionally, there is no federal fundamental right to education, as the United States Supreme Court, in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (a case involving a challenge to Texas’s public-school funding method), has held that no such right exists under the federal constitution.
Amendment 111 provides:
“It is the policy of the state of Alabama to foster and promote the education of its citizens in a manner and extent consistent with its available resources, and the willingness and ability of the individual student, but nothing in this Constitution shall be construed as creating or recognizing any right to education or training at public expense, nor as limiting the authority and duty of the legislature, in furthering or providing for education, to require or impose con *823 ditions or procedures deemed necessary to the preservation of peace and order.
“The legislature may by law provide for or authorize the establishment and operation of schools by such persons, agencies or municipalities, at such places, and upon such conditions as it may prescribe, and for the grant or loan of public funds and the lease, sale or donation of real or personal property to or for the benefit of citizens of the state for educational purposes under such circumstances and upon such conditions as it shall prescribe. Real property owned by the state or any municipality shall not be donated for educational purposes except to nonprofit charitable or eleemosynary corporations or associations organized under the laws of the state.
“To avoid confusion and disorder and to promote effective and economical planning for education, the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end, such election to be effective for such period and to such extent as the legislature may provide.”
Amend. No. 111, § 256, Ala. Const.1901.
The plaintiffs moved for a partial summary judgment, asking the trial court to declare Amendment 111 unconstitutional under the Fourteenth Amendment’s Equal Protection Clause. Decisions by this Court and by a three-judge panel of the federal district court, whose decision was affirmed by the United States Supreme Court, had previously declared that Amendment 111 was the law of Alabama and that the Amendment served as the conduit through which the Legislature was free to repeal school-segregation laws. See Mitchell v. McCall, 273 Ala. 604, 606, 143 So.2d 629, 630 (1962) (stating that Amendment 111 imposes on the State of Alabama “no constitutional obligation to provide public schools”); Opinion of the Justices No. 179, 275 Ala. 547, 550, 156 So.2d 639, 643 (1963) (stating that, under Amendment 111, “it appears that the power to provide for the operation of schools is in the legislature”); Shuttlesworth v. Birmingham Bd. of Educ., 162 F.Supp. 372, 379-81 (N.D.Ala.1958) (in which Judge Richard Rives, writing for himself and Judges Lynn and Grooms, specifically addressed Amendment 111 and the constitutionality of the “School Placement Law” enacted in conjunction with the Amendment, pointing out that, without Amendment 111, the original § 256 (which explicitly required segregated schools) would represent the law in Alabama), aff'd, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145 (1958) (memorandum). Although the Shuttlesworth opinion dealt with the constitutionality of the School Placement Law enacted after the ratification of Amendment 111, the plaintiffs in that case proffered the same evidence of “improper motivation” that the parties in this case offered. Judge Rives noted: “If, however, we could assume that the Act was passed by the legislature with an evil and unconstitutional intent, even that would not suffice,” because the impact of the implementation of the law must also be unconstitutional. Shuttlesworth, 162 F.Supp. at 381. As noted above, the United States Supreme Court affirmed this holding.
Even so, the trial court entered the following order on August 13, 1991:
“1. Amendment 111, Section 256 of the Alabama Constitution is declared and hereby is void ab initio and in its entirety under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
“2. The mandate of Section 256 of the Alabama Constitution of 1901 is declared, and hereby is, in effect to the *824 extent that it provides: ‘The legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years.’ The second and third sentences of Section 256 of the Alabama Constitution of 1901 are declared to be without force or effect under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
“Copies of this order shall be distributed forthwith by the Clerk of this Court to all counsel of record.
“DONE and ORDERED this 13th day of August, 1991.”
(Footnotes omitted.) On October 18, 1991, the trial court purported to make this order final pursuant to Rule 54(b), Ala. R. Civ. P.; this Court has never addressed the finality of that August 13, 1991, order.
The August 13, 1991, order provided the necessary foundation for the trial court’s March 31, 1993, order, which essentially held that “the present system of public schools in Alabama violates the constitutional mandate of art. XIV, § 256, and the provisions of art. I[,] §§ 1, 6, 13, and 22 of the Alabama Constitution.” (March 31, 1993, Order, Appendix to Opinion of the Justices No. 338, 624 So.2d 107, 110 (Ala.1993)). The foundational nature of the August 13, 1991, order was made clear in James v. Alabama Coalition for Equity, Inc., 713 So.2d 937, 947-50 (Ala.1997), in which we held that the plaintiffs were entitled to recover attorney fees under 42 U.S.C. § 1988 because they had prevailed in asserting their federal claim; namely, striking down Amendment 111 under the Equal Protection Clause of the Fourteenth Amendment. In response to the defendant’s assertions “that the [March 31, 1993,] Liability Phase judgment was based entirely on the Constitution of Alabama,” 713 So.2d at 949, and thus did not rest upon the August 13, 1991, resolution of the plaintiffs federal claims, Justice Cook, writing for the Court, stated:
“On the contrary, the only basis for its [March 31,1993] holding that the system by which Alabama administered its public schools violated §§ 1, 6, 13, 22, and 256 of the Alabama Constitution was its [August 13, 1991,] holding that Amendment 111 was unconstitutional, and, therefore, inapplicable. Had it held otherwise, the trial court would then have been unable to locate any principle of logic or constitutional construction of which we are aware that would have enabled it to circumvent the specific provisions of Amendment 111 — nullifying the mandate of § 256 — and, thereby, to reach the result obtained in the Liability Phase. In a real sense, the court’s holding that Amendment 111 violated the Fourteenth Amendment is the linchpin of this entire action. We hold, therefore, that the plaintiffs-cross appellants, who prevailed on this pivotal question of federal constitutional law as the basis for the entire action, are entitled to an award of attorney fees, pursuant to § 1988.”
James v. Alabama Coalition for Equity, Inc., 713 So.2d at 950.
Essentially, the August 13, 1991, order is, by necessity, incorporated into and inseparable from the March 31, 1993, order. With this in mind, I turn now to an examination of the fundamental question of the trial court’s subject-matter jurisdiction.
Essential to the validity of any action by a trial court is proper subject-matter jurisdiction. Accordingly, any examination of an order issued by a trial court includes an examination of that court’s subject-matter jurisdiction. A jurisdictional defect, when discovered, is of such an important nature that it may be raised by a reviewing court, *825 ex mero motu if necessary. Ex parte State ex rel. James, 711 So.2d 952, 959-60 (Ala.1998).
Addressing jurisdictional matters is not a procedure foreign to our decisions in the Equity Funding Case. We followed this very procedure in Ex parte James (the very case before us now based upon our June 29, 2001, order vacating our remand in that case). In Ex parte James, we declined to examine the merits of the Liability Order but made it clear that a review of the trial court’s subject-matter jurisdiction was appropriate, even after we had issued two opinions related to this litigation in Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995); and Opinion of the Justices No. 338, 624 So.2d 107 (Ala.1993):
“Because the Liability Phase was never appealed, we are here presented with no issue as to the correctness of that holding. The only issue that we may consider is whether the trial court — in addressing the merits of this dispute— violated the separation of powers doctrine of our constitution. If it did, then it had no subject matter jurisdiction and the judgment was void. We may address this issue because ‘[t]he lack of subject matter jurisdiction is not waiva-ble and may be raised at any time by the suggestion of a party or by a court ex mero motu.’ Judgments entered without subject-matter jurisdiction can ‘be set aside at any time as void, either on direct or on collateral attack.’ ”
Ex parte James, 713 So.2d at 878 (citations omitted). While the Court in Ex parte James wrestled with the issue of political questions, I believe that the equally fundamental issue of standing — an issue yet to be addressed — should be determinative here.
A plaintiffs standing is an essential (and, in fact, the chief) component of justi-ciability:
“Not all controversies, even very public ones, are justiciable. Justiciability is a compound concept, composed of a number of distinct elements. Chief among these elements is the requirement that a plaintiff have ‘standing to invoke the power of the court in his behalf’ Ex parte Izundu, 568 So.2d 771, 772 (Ala.1990).”
Ex parte State ex rel. James, 711 So.2d at 960 (emphasis added); see also Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (stating that because “the question of standing goes to this Court’s jurisdiction ... we must decide the issue even though the court below passed over it without comment” (citation omitted)). As this Court stated in State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1027-28 (Ala.1999), standing requires injury in fact:
“Standing ... turns on ‘whether the party has been injured in fact and whether the injury is to a legally protected right.’ Romer v. Board of County Comm’rs of the County of Pueblo, 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting) (emphasis added). See also NAACP v. Town of East Haven, 892 F.Supp. 46 (D.Conn.1995)....
[[Image here]]
“When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction. Barshop v. Medina County Underground Water Conservation District, 925 S.W.2d 618, 626 (Tex.1996) (‘Standing is a necessary component of subject matter jurisdiction’). See also Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997); Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); United States v. *826 Hays, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (‘“standing ‘is perhaps the most important of [the jurisdictional] doctrines’ ” ’); National Organization for Women, Inc., v. Scheidler, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (‘Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.’); Romer v. Board of County Comm’rs of the County of Pueblo, supra, 956 P.2d at 585 (‘standing is a jurisdictional prerequisite to every case and may be raised at any stage of the proceedings’) (Martinez, J., dissenting); Cotton v. Steele, 255 Neb. 892, 587 N.W.2d 693 (1999).”
In the context of a challenge to a provision’s facial constitutionality, the plaintiffs injury must “directly aris[e] from” the language of the provision. See Ex parte Blue Cross & Blue Shield of Alabama, 582 So.2d 469, 474 (Ala.1991); Virginia v. American Booksellers Ass’n, 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (plaintiffs had standing to make facial challenge to the constitutionality of a statute because the statute was “aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution”); Initiative & Referendum Inst. v. Walker, 161 F.Supp.2d 1307, 1310 (D.Utah 2001) (plaintiffs, whose alleged injury was “directly traceable to the existence of’ an amendment to the Utah Constitution, had standing to challenge the facial constitutionality of that amendment).
My review of this case convinces me that the plaintiffs have no standing to challenge the facial constitutionality of Amendment 111. As stated above, standing to challenge Amendment 111 would require that the plaintiffs demonstrate that they have been “injured in fact” by the existence of Amendment 111. The problem is that Amendment 111 cannot itself be the source of the alleged injuries.
It should be apparent that Amendment 111 — through which the Legislature was able to repeal the various forced segregation laws[12] — merely authorizes certain legislative activities and requires or precludes virtually none. The first paragraph states a general policy of “fostering and promoting” education and declares that the Alabama Constitution of 1901 provides no fundamental right to a public education.[13] Of course, the citizens of a state *827 are free to construct their state constitution in any way they deem fit, and they are, therefore, not required to recognize any particular right. There can be no “injury in fact” stemming from this language.
The second paragraph includes the only actual requirement to be found in the entire Amendment 111 — that “[r]eal property owned by the state or any municipality shall not be donated for educational purposes except to nonprofit charitable or eleemosynary corporations or associations organized under the laws of the state.” Not surprisingly, the plaintiffs do not allege any injury under this language. The remainder of the second paragraph, as characterized by the first three words (“The legislature may”), is a mere authorization for the establishment of schools “upon such conditions as [the Legislature] may prescribe” (emphasis added). There is no method prescribed, duty imposed, or action required or prohibited; therefore, there is no possible injury in fact to the plaintiffs.
Likewise, in terms of active language that binds or compels the actions of the Legislature, the third paragraph is similarly barren. Under this paragraph, the Legislature “may” allow parents to choose to send their children to private, racially segregated schools — something' that, according to decisions of the United States Supreme Court, parents of any race had the right to do at the time Amendment 111 was proposed and ratified.[14] While interpreting this paragraph as somehow allowing parents to send their children to racially segregated public schools is wholly irrational, given that such schools were declared unconstitutional before Amendment 111 was even proposed, see Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), even this irrational interpretation would not provide a basis for these plaintiffs to demonstrate standing unless racially segregated public schools had in fact been established by the State. Of course, this is not the case, see Shuttlesworth v. Birmingham Board of Education, 162 F.Supp. 372 (N.D.Ala.1958), aff'd, 358 U.S. 101, 79 S.Ct. 221, 3. L.Ed.2d 145 (1958) (memorandum), and the plaintiffs do not so allege.
What the plaintiffs appear to allege as the “injury” is the effects of school-funding *828 policies promulgated while Amendment 111 was in effect,[15] i.e., that because Amendment 111 was proposed and ratified with an improper purpose[16] — an attempt to temper the United States Supreme Court’s mandate in Brown — the “injuries” stemming from these policies are therefore “injuries” stemming from Amendment 111. If the fallacy of this reasoning is not apparent on its face, it is easily demonstrated by the following example.
Imagine that the following hypothetical constitutional provision was, for some racist purpose, proposed and ratified as an amendment to the Alabama Constitution:
“The Legislature may enact laws regulating the riding of bicycles on public streets.”
Subsequently, the Legislature enacts a statute restricting only white citizens from riding bicycles on public streets. It is obvious that those white citizens would have been injured so as to have standing to challenge the constitutionality of the statute. However, those white citizens were in no way injured by the amendment itself, because the amendment — even though created with racist motivations— did not in any way compel the Legislature to regulate at all, let alone to regulate in an unconstitutional manner.
Given the nature of the language of Amendment 111, it is not surprising that the plaintiffs have failed- — even after having been notified that the issue of standing was under examination — to address specifically how Amendment 111 itself causes any injury in fact to the plaintiffs. In short, the plaintiffs can show no injury in fact from Amendment 111 because the Amendment actually allows the Legislature to provide any type of funding method it so desires, and therefore does not preclude the Legislature from adopting— and in fact gives the Legislature the power to adopt — the very same funding method sought by the plaintiffs in this case! The ACE plaintiffs even acknowledge this fact in their complaint, which states that Amendment 111 “appears to authorize any kind of funding system for education.” (ACE complaint at 23, emphasis in original.)
Without any basis from which to demonstrate that they have been injured by the *829 existence of Amendment 111 itself, rather than by school-funding policies promulgated while Amendment 111 happened to be in effect, the plaintiffs in this case have no standing to challenge the constitutionality of Amendment 111. Without standing, the constitutional challenge to Amendment 111 is nonjusticiable, a fact that renders the trial court without jurisdiction to rule on the issue.
As stated above, because the trial court’s ruling on this issue is “the only basis for its [March 31, 1993,] holding that the system by which Alabama administered its public schools violated §§ 1, 6, 13, 22, and 256 of the Alabama Constitution,” and because this sole basis — indeed the essential and undisputed foundation of the March 31, 1993, order — is, in my opinion, void because of a fundamental and fatal jurisdictional defect, had the State of Alabama requested that this Court vacate the Liability Order, I would have voted to do so on this basis.
Certainly, Amendment 111 is not rendered impervious to challenge simply because its language is inert; the citizens of this State reserved to themselves the ability to challenge any constitutional provision through the amendment procedure described in Article XVIII of the Alabama Constitution of 1901, as amended. In fact, this procedure allows the added benefit of not only nullifying the effect of a constitutional provision (which is the result of having the provision declared unconstitutional), but of changing the substance of the provision itself to reflect the specific desires of the citizenry. The power to rewrite the constitution properly rests in the hands of the people, and not in the judiciary; it is of this power that the plaintiffs in this case, in my opinion, should have availed themselves.[17]
*830 II.
Assuming that the plaintiffs had standing, which they did not; and assuming that the trial court was correct in holding that Amendment 111 was unconstitutional, which it was not;[18] the voidance of an amendment to a constitutional provision does not automatically revive the unamended provision.
It is true that Alabama recognizes the common-law rule of statutory construction that a predecessor statutory provision is revived when the repealing statute is held unconstitutional.
“Revival of predecessor statutes has long been a part of American jurisprudence. See, E. Crawford, The Construction of Statutes, § 321 (1940). Simply stated, revival means that the very act of declaring a statute unconstitutional brings the predecessor statute or the applicable common law rule back into full force. See, id.; and Dewrell v. Kearley, 250 Ala. 18, 32 So.2d 812 (1947). Thus, the trial court’s declaration that Act No. 82-444 was unconstitutional automatically gave new life to the predecessor statutes, Acts No. 76-710 and 80-797.”
Deputy Sheriffs Law Enforcement Ass’n v. Mobile County, 590 So.2d 239, 242-43 (Ala.1991). However, the rule of automatic revival of predecessor statutes is not similarly applicable to the revival of constitutional provisions. Davis v. Synhorst, 225 F.Supp. 689 (S.D.Iowa 1964). With regard to constitutional provisions, the intent of the Legislature to repeal the predecessor provision is controlling. Id. Where the Legislature has intended that the subsequent amendment repeal the predecessor provision, there is no revival of the preexisting provision. Id.; City of Klamath Falls v. Oregon Liquor Control Comm’n, 146 Or. 83, 29 P.2d 564 (1934) (refusing to use the statutory-revival rule to revive a constitutional provision that had been implicitly repealed by two subsequent amendments after those subsequent amendments were themselves repealed). Therefore, the question becomes: did the Alabama Legislature intend for Amendment 111 to repeal the original § 256? The answer is yes.
Clearly, Amendment 111 repealed the original § 256, because it is a complete revision of that section. An amendment to the Alabama Constitution “must prevail over, operate a repeal or modification of any other inconsistent or repugnant elder provisions in the Constitution, to the extent such inconsistency or repugnancy exists.” Opinion of the Justices No. 1, 209 Ala. 593, 601, 96 So. 487, 496 (1923). Furthermore, the differences between the original § 256 and the amended provisions make it clear that Amendment 111 was intended to replace the original § 256. Therefore, because by ratifying Amendment 111 the people clearly repealed the original § 256, it could not automatically be revived by a declaration that Amendment 111 is unconstitutional.
III.
Assuming that the plaintiffs had standing, which they did not; assuming that the trial court was correct in holding that Amendment 111 was unconstitutional, which it was not; and assuming that the trial court was correct in holding that its finding that Amendment 111 was unconstitutional automatically revived the original *831 § 256, which it was not; Amendment 111 cannot logically, rationally, or coherently be unconstitutional and wholly void while part of the original § 256 is constitutional and remains in effect.
The clause in § 256 as amended by Amendment 111 that, according to the trial court violates the Fourteenth Amendment, states that “the legislature may authorize the parents or guardians of minors, who desire that such minors shall attend schools provided for their own race, to make election to that end.... ” (Emphasis added.) The original § 256 contains a sentence that stated: “Separate schools shall be provided for white and colored children, and no child of either race shall be permitted to attend a school of the other race.” (Emphasis added.) Amendment 111 uses the word “may,” while the original § 256 uses the word “shall.”
“ ‘The word “shall” has been defined as follows:
“ ‘ “As used in statutes, contracts, or the like, this word is generally imperative or mandatory. In common or ordinary parlance, and in its ordinary signification, the term ‘shall’ is a word of command, and one which has always [been given] or which must be given a compulsory meaning; as denoting obligation. The word in ordinary usage means ‘must’ and is inconsistent with a concept of discretion.”
“ ‘Black’s Law Dictionary 1375 (6th ed. [1990]).’
“Ex parte Prudential Ins. Co. of America, 721 So.2d 1135, 1138 (Ala.1998).”
Ex parte Looney, 797 So.2d 427, 428-29 (Ala.2001). See also State ex rel. Hartman v. Thompson, 627 So.2d 966, 970 (Ala.Civ.App.1993) (“In the absence of clear legislative intent to the contrary, the word ‘shall’ is to be afforded a mandatory connotation when it appears in a statute.”). In contrast, as discussed above, the word “may” denotes a permissive act, as opposed to a mandatory act. American Bankers Life Assurance Co. v. Rice Acceptance Co., 739 So.2d 1082 (Ala.1999). According to the plain language of each provision, the original § 256 mandated that public schools be provided for children and mandated that those schools be segregated, while Amendment 111 mandated nothing. Therefore, under the trial court’s reasoning, if Amendment 111, which mandates nothing, is unconstitutional in its entirety, based only upon a racist intent, then, certainly, the original § 256 must also be unconstitutional in its entirety because it commands that the State provide segregated schools.
In an attempt to support the reasoning behind the disparate treatment of the first paragraph of Amendment 111 and the first sentence of the original § 256, the trial court’s order misleadingly sets out selected portions of the chairman’s opening address to the 1901 constitutional convention. The trial court did not refer to the portion of the chairman’s address that shows the racist intent of the 1901 Convention. See 1 Official Proceedings of the Constitutional Convention of 1901, pp. 7-14.
The trial court does hold in its August 13, 1991, order that a portion of the original § 256 is unconstitutional. However, the trial court’s construction of Amendment 111 cannot be reconciled with its construction of the original § 256. The trial court’s 1991 order states:
“1. Amendment 111, Section 256 of Alabama Constitution is declared and hereby is void ab initio and in its entirety under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
“2. The mandate of Section 256 of the Alabama Constitution of 1901 is declared, and hereby is, in effect to the extent that it provides: ‘The legislature *832 shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years.’ The second and third sentences of Section 256 of the Alabama Constitution of 1901 are declared to be without force or effect under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.”
(Footnotes omitted.) If, under the rationale of the trial court, Amendment 111 violated the Fourteenth Amendment because the Amendment had a discriminatory intent, then, certainly, the original § 256 did as well. See, e.g., 1 Official Proceedings of the Constitutional Convention of 1901, pp. 7-14.
The trial court voided, without any analysis or explanation, Amendment 111 in its entirety as violating the Fourteenth Amendment; in contrast, when it came to the original § 256, the trial court simply severed the last two sentences instead of declaring the whole provision void as it did with Amendment 111. The trial court gives no explanation for the different treatment of the two provisions, and we can find no such explanation in the law.
Assuming that the trial court was correct in holding that Amendment 111 was unconstitutional, which it was not; assuming that the trial court was correct in holding that its finding that Amendment 111 was unconstitutional automatically revived the original § 256, which it did not; and assuming that the trial court could disparately hold that Amendment 111 was void in its entirety, while only some of original § 256 was unconstitutional, which it could not; how could the trial court hold that the second sentence of original § 256 violates the Equal Protection Clause of the Fourteenth Amendment?
That sentence provides:
“The public school fund shall be apportioned to the several counties in proportion to the number of school children of school age therein, and shall be so apportioned to the schools in the districts or townships in the county as to provide, as nearly as practicable, school terms of equal duration in such school districts or townships.”
Certainly, the judicial mind cannot reasonably comprehend how this second sentence of original § 256 offends the Equal Protection Clause of the Fourteenth Amendment. It does not. How could this be more equal? The State is to provide an equal amount for each child of school age (as defined by the first sentence of the original § 256 as ages 7 through 21), regardless of race, color, creed, gender, citizenship, or national original, regardless of where that child lives in Alabama. Each child receives the same amount from the State for his or her education. I can only assume that this sentence had to be removed to allow the trial court to interpret the word “liberal” in the first sentence of the original § 256 unrestrained by the command for equality. The second sentence of original § 256 violates no equal-protection clause, and the trial court erred when, without explanation, it held that it did.
IV.
In response to Justice Johnstone’s dissent, I believe that it is essential to note that our inquiry was not initiated ex nihi-lo, but rather was prompted only after the yet unreviewed March 31, 1993, Liability Order was raised before us by parties— some of whom were parties in the Equity Funding Case — as a defense to proration in Siegelman v. Alabama Association of School Boards, 819 So.2d 568 (Ala.2001).
*833 In our review of the Siegelman case, we discovered that there may in fact be a jurisdictional problem relating to the finality of the March 31, 1993, order. Therefore, in an exercise of our supervisory and inherent appellate powers, we issued— without dissent — the following order on the same day we released our June 29, 2001, decision in Siegelman, ex mero motu recalling our remand of the case in Ex parte James:

“ORDER

“On December 3, 1997, we remanded cases 1950030, 1950031, 1950240, 1950241, 1950408, and 1950409 to the trial court with directions that that court retain jurisdiction. In order that the question of this Court’s subject-matter jurisdiction over those cases may be addressed, that remand order is ex mero motu vacated to the limited extent of requiring the parties to present briefs directed to the issue whether the order in the Liability Phase entered on March 31,1993, declaring that Alabama’s public education system violated ‘Ala. Const, art. I, §§ 1, 6, 13, and 22 ... and art. XIV, § 256 ... ’ was a final, appealable order.
“All parties are given 28 days from the date of this order, to file briefs addressing this limited issue.”
Eight Justices of this Court, including Justice Johnstone, concurred with this order; one Justice recused himself.[19] See June 29, 2001, order of this Court attached to this special writing as an appendix.
It cannot be denied that our review of the Equity Funding Case has proceeded along an unusual path; however, given the highly unusual nature of the Equity Funding Case,[20] that fact should be unremarkable. However, the fact that a court’s action does not navigate a familiar course does not automatically indicate that the court is without authority so to navigate. Instead, as is true in this case, it may simply mean that unusual circumstances have compelled the court to exercise little-used but quite legitimate powers. I believe that our June 29, 2001, order implicates two such powers: our general powers of supervisory authority as the Supreme Court of Alabama over courts of inferior jurisdiction and our inherent appellate power to recall our judgments.

A Supervisory Authority

This Court, as the Supreme Court of Alabama, has constitutionally grounded supervisory authority over the State courts of Alabama.[21] Amendment 328, § 6.02(b), Ala. Const.1901, Amending Art. VI, § 140 (“The supreme court shall have original jurisdiction ... to issue such remedial writs or orders as may be necessary to *834 give it general supervision and control of courts of inferior jurisdiction”);[22] Ex parte Burch, 236 Ala. 662, 666, 184 So. 694, 698 (1938) (stating that the Supreme Court of Alabama “possesses supervisory power over inferior tribunals, and it is its clear duty to exercise that power whenever it is made to appear that an inferior court is guilty of usurpation or abuse of jurisdiction”). Accordingly, just as the United States Supreme Court is the final arbiter of federal law, see, e.g., New York v. Ferber, 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (stating that “this Court is the final arbiter of whether the Federal Constitution necessitated the invalidation of a state law”); Grantham v. Avondale Indus., Inc., 964 F.2d 471, 473 (5th Cir.1992) (noting that “[i]t is beyond cavil” that the federal courts are not bound by state-court interpretations of federal law), the Supreme Court of Alabama is the final arbiter of Alabama law, with ultimate authority to oversee and rule upon the decisions of the lower State courts. See Wainwright v. Goode, 464 U.S. 78, 84, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (stating that “the views of [a] state’s highest court with respect to state law are binding on the federal courts”); Minnesota v. National Tea Co., 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940) (“It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions.[Sjtate courts will not be the final arbiters of important issues under the federal constitution; and ... we will not encroach on the constitutional jurisdiction of the states.”); see also Ala.Code 1975, § 12-2-7(6)(a) (barring the Alabama Supreme Court from transferring to the Alabama Court of Civil Appeals “[a] case that ... presents a substantial question of ... state constitutional law”).
And like the United States Supreme Court’s duty with regard to the federal constitution, our status as final arbiter imputes to us a particularly important duty with regard to the Alabama Constitution, because while our interpretations of statutes can be, in a sense, “overruled” by subsequent legislative enactment, our interpretations of the Alabama Constitution are beyond legislative alteration. See Marsh v. Green, 782 So.2d 223, 232 (Ala.2000) (noting that, in cases involving constitutional adjudication, the doctrine of stare decisis plays little role “because, in such cases, ‘ “ ‘correction through legislative action is practically impossible.’ ” ’ ” (quoting Seminole Tribe of Florida v. Florida, 517 U.S. 44, 63, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996))); see also Agostini v. Felton, 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (noting that the policy which undergirds the principle of stare decisis — that sometimes “it is more important that the applicable rule of law be settled than that it be settled right” — “is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions” (quoting Burnet v. Coronado Oil *835 & Gas Co., 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting))); City of Boerne v. Flores, 521 U.S. 507, 535-36, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (discussing Congress’s inability to change the Court’s interpretation of the United States Constitution); Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (noting that the Supreme Court has a “solemn responsibility for maintaining the Constitution inviolate”) (citing Martin v. Hunter’s Lessee, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816); and Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)).
Additionally, the instillation of supervisory authority in a sovereign’s highest court is not a concept unique to Alabama. See, e.g., United States v. Hale, 422 U.S. 171, 180 n. 7, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975) (“We recognize that the question whether evidence is sufficiently inconsistent to be sent to the jury on the issue of credibility is ordinarily in the discretion of the trial court. ‘But where such evidentia-ry matter has grave constitutional overtones ... we feel justified in exercising this Court’s supervisory control.’ ” (quoting Grunewald v. United States, 353 U.S. 391, 423-24, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957))); Dominguez v. Enterprise Leasing Co., 197 Ga.App. 664, 666, 399 S.E.2d 269, 271 (1990) (“The superior courts have ever in our history been the great reservoir of judicial power — the aula regis, as it were — in which the judicial powers of the state were vested, and ... the practice has been uniform to retain in [the Supreme Court] ... supervisory power over them .... ” (quoting Porter v. State, 53 Ga. 236, 238 (1874))); Winder v. State, 640 So.2d 893, 900 (Miss.1994) (Hawkins, J., concurring specially) (“Contrary to many state constitutions which give their supreme courts supervisory power over trial courts in addition to appellate jurisdiction, our Constitution is silent as to such authority. We have nonetheless asserted and exercised a supervisory power over trial courts ... as inherent in us by virtue of being the final court of appeals in this State.”); Tenn.Code § 16-3-501 (1994) (stating that the Tennessee Supreme Court “is hereby granted and clothed with general supervisory control over all the inferior courts of the state”).
Furthermore, examples of courts exercising this extraordinary power in extraordinary circumstances are not difficult to find. In State Farm Mutual Automobile Insurance Co. v. Robbins, 541 So.2d 477 (Ala.1989), we examined a remittitur that had been raised in a judgment notwithstanding the verdict, but that had been effectively waived by the filing of a notice of appeal. Given the extremely unique circumstances of the procedural posture of the case, we described the case as “sui generis,” and, in an exercise of our supervisory powers, we considered the remitti-tur as though it had not been waived. Id. at 479.
In Panama R. Co. v. Napier Shipping Co., 166 U.S. 280, 17 S.Ct. 572, 41 L.Ed. 1004 (1897), the court of appeals had originally reversed a decree dismissing a libel in admiralty, and remanded the case for a determination of damages. On the second appeal, it affirmed the determination of damages. It was argued that on certiorari review of the final judgment, the Supreme Court could review only the damages issue. That argument was rejected:
“If, under such circumstances, this court were powerless to examine the whole case upon certiorari, we should then be compelled to issue it before final decree, whereas, as was recently said ..., it is and generally should be issued only after a final decree.... But, while the Court of Appeals may have been limited on the second appeal to ques *836 tions arising upon the amount of damages, no such limitation applies to this court, when/m the exercise of its supervisory jurisdiction, it issues a writ of certiorari to bring up the whole record. Upon such writ the entire case is before us for examination.”
Id. at 284, 17 S.Ct. 572 (emphasis added). Although the final order had not been issued, the United States Supreme Court exercised its supervisory jurisdiction to review the entire case. See also Jackson v. Jackson, 425 So.2d 379 (La.Ct.App.1982) (holding that although “the judgment of the trial court is not an appealable partial final judgment” under Louisiana law, “by exercising our supervisory jurisdiction, this court has authority to review the case”); Barber v. Commonwealth, 353 Mass. 236, 239, 230 N.E.2d 817, 819 (1967) (stating that “[w]hile these [supervisory] powers are by nature extraordinary, in an appropriate case this court could and should act at whatever stage in the proceedings it becomes necessary to protect substantive rights” (emphasis added)).
Our supervisory authority, while broad, is certainly not unlimited; its use is governed by the particular circumstances of a case in accordance with our “clear duty to exercise that power whenever it is made to appear that an inferior court is guilty of usurpation or abuse of jurisdiction.” Burch, 236 Ala. at 666, 184 So. at 698. I believe that the exceptional circumstances of this case certainly validate the use of this power.

B. Inherent Power to Recall Judgments

Related to our general supervisory authority, this Court, as an appellate court, has the inherent power to recall its judgments. See, e.g., Ex parte Martin, 616 So.2d 353 (Ala.1992) (placing a case on rehearing ex mero motu after initially denying the defendant’s 1991 petition for cer-tiorari review); Brown v. State, 277 Ala. 108, 167 So.2d 291 (1964) (discussing generally the ability to recall a judgment); see also Youngblood v. State, 372 So.2d 34, 35 (Ala.Crim.App.1978) (placing a case on rehearing ex mero motu in light of a problematic intervening opinion, in order “[t]o avoid confusion and to assure a final judgment of this court in the instant case conformable to the present views of this court”); Watts v. State, 337 So.2d 91 (Ala.Crim.App.1976) (restoring a case to the rehearing docket ex mero motu); Dye v. Kansas State Supreme Court, 48 F.3d 487, 490-91 (10th Cir.1995) (noting the Kansas Supreme. Court’s “general supervisory powers” and holding that the court had the right to recall and correct the mandate of the Kansas Court of Appeals).
This power has been and continues to be widely recognized as a power inherent in federal and state appellate courts. See, e.g., Calderon v. Thompson, 523 U.S. 538, 549, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (stating that “the courts of appeals are recognized to have an inherent power to recall their mandates”); IAL Aircraft Holding, Inc. v. Federal Aviation Admin., 216 F.3d 1304, 1305-07 (11th Cir.2000) (recalling mandate and vacating earlier decision after the court learned of a jurisdictional defect in the earlier decision); Sargent v. Columbia Forest Prods., Inc., 75 F.3d 86, 89-90 (2d Cir.1996) (discussing generally the court’s “unquestioned” ability to recall a mandate); Demjanjuk v. Petrovsky, 10 F.3d 338, 356 (6th Cir.1993) (reopening ex mero motu a habeas proceeding the court had affirmed six years earlier); Coleman v. Turpen, 827 F.2d 667, 671-72 (10th Cir.1987) (recalling ex mero motu a mandate issued over two years before, and stating that “an appellate court has power to set aside at any time a mandate that was procured by fraud or act to prevent an injustice, or to *837 preserve the integrity of the judicial process”); Uzzell v. Friday, 625 F.2d 1117, 1119-21 (4th Cir.1980) (describing reasons for recall of mandate and reargument of case); Greater Boston Television Corp. v. FCC, 463 F.2d 268, 275-80 (D.C.Cir.1971) (discussing generally the power to recall an appellate mandate); State v. Earl, 336 Ark. 271, 273, 984 S.W.2d 442, 443 (1999) (noting, as an example of the appropriate use of the inherent recall power, “when a subsequent Supreme Court decision renders a previous appellate court decision demonstrably wrong”); District of Columbia v. Stokes, 785 A.2d 666, 671 (D.C.2001) (discussing the court’s inherent authority to recall mandate to prevent injustice); John W. Brown Props. v. Blaine County, Idaho, 132 Idaho 60, 61-62, 966 P.2d 656, 657-58 (1997) (citing cases from various jurisdictions); Jameson Chem. Co. v. Love, 403 N.E.2d 928, 928 (Ind.Ct.App.1980) (stating that “[t]he Court of Appeals has inherent power to correct, on its own motion, an error in a decision and an opinion it has handed down”); Harrison v. Harrison, 109 Md.App. 652, 681-82, 675 A.2d 1003, 1017-18 (1996) (stating that “even absent a statute permitting the correction of judgments, i.e., mandates, an appellate court has always had the inherent power to correct its mandates” and citing several other states’ recognition of that power); State v. Breit, 122 N.M. 655, 660, 930 P.2d 792, 797 (1996) (“Appellate courts have the power, in exceptional situations, to recall one of their own mandates after it has issued.” (citing Lindus v. Northern Ins. Co., 103 Ariz. 160, 162, 438 P.2d 311, 313 (1968))).
It is true that appellate courts have historically adopted self-imposed time limitations on their power to recall judgments. For example, the Florida Supreme Court generally follows a rule pursuant to which the Court’s power to recall its judgment ends at the conclusion of the “term” within which the judgment being recalled was rendered.[23] Chapman v. St. Stephens Protestant Episcopal Church, 105 Fla. 683, 138 So. 630 (1932). We specifically adopted the rule as stated in Chapman in Brown v. State, supra, 277 Ala. at 109, 167 So.2d at 292-93. However, this “term” limitation is not considered to be constitutionally (or otherwise) mandated; rather, it is merely an arbitrary, but historical, rule based upon pragmatic concerns relating to “ending litigation”; even then the rule provided for exceptional circumstances:
“The prevailing rule is that an appellate court is without power to recall a mandate regularly issued without inadvertence and resume jurisdiction of the cause after the expiration of the term at which its judgment was rendered and the mandate issued. It also appears to be a rule, sustained by an overwhelming weight of authority, that a judgment rendered by an appellate court cannot be vacated or amended by such court after the expiration of the term at which it was rendered, except for the purpose of correcting clerical error and mistake, or perhaps where shown for some reason to be absolutely void. This is in keeping with the sound principle of jurisprudence that some time, somewhere within reasonable limits, there must be an end to litigation.”
Washington v. State, 92 Fla. 740, 745, 110 So. 259, 260-61 (1926) (cited in Chapman, *838 supra, 105 Fla. at 696-97, 138 So. at 631-32) (citations omitted; emphasis added).
While “terms of court” technically exist with regard to Alabama’s appellate courts, see Ala.Code 1975, §§ 12-2-8, 12-2-9, and 12-3-12, they have not served a significant jurisprudential role because the Alabama appellate courts have always remained open. The Legislature has provided that the Supreme Court’s regular term commences on the first Monday in October and ends on the last day of June of the ensuing year. Ala.Code 1975, § 12-2-8. This would assure the Supreme Court a three-month recess, as is taken by the United States Supreme Court. However, since 1985, when I became a Justice on the Court, the Supreme Court has remained open year-round, ordering and holding a special term for the months of July, August, and September, which we are authorized to do by Ala.Code 1975, § 12-2-9.
Furthermore, the notion that an appellate court’s inherent power to recall its mandate is strictly and in all circumstances limited by the “term” of court has fallen on hard times. The outdated nature of the “term of court” designation and the arbitrary nature of the “term” limitation was recently acknowledged by one Florida court,
“The concept of a ‘term of court’ in the 21st century seems odd and anachronistic. It is a relic of an agrarian time when cases were fewer and courts did not sit continuously in session. It was also forced by the slow pace of travel in a large geographic district when the court moved from place to place within the district to hold court. We now sit throughout the year (except for August when we schedule no oral arguments) and easily travel within our district to hold court. It is no longer necessary to designate specific ‘terms of court’ when everyone can expect that court will be held. It would therefore seem that it is long past time for the legislature to send this relic to history’s museum as an oddity, like the powdered wig and the quill pen, tied to our beginnings. Today it seems that the only junction of a term of court is to artificially limit our power to recall a mandate.”
Pinecrest Lakes, Inc. v. Shidel, 802 So.2d 486, 487 n. 2 (Fla.Dist.Ct.App.2001) (emphasis added). Moreover, the “term” limitation has been completely abandoned in the federal system:
“Our power to recall a mandate is unquestioned. See generally 16 Charles A. Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, Federal Practice and Procedure § 3938 (1977). The power ‘apparently originated in the inherent power of all federal courts to set aside any judgment during the term of court at which it was entered.’ Id. at 276. It ‘exists as part of the court’s power to protect the integrity of its own processes,’ Zipfel v. Halliburton Co., 861 F.2d 565, 567 (9th Cir.1988), and is analogous to the power conferred on district courts by Fed.R.Civ.P. 60(b).
“Amendments to the federal judicial code in 1948 extended this power beyond the current term of court, see 28 U.S.C. § 452, and we thus have the power to reopen a case at any time. Fine v. Bellefonte Underwriters Ins. Co., 758 F.2d 50, 53 (2d Cir.), cert. denied, 474 U.S. 826, 106 S.Ct. 86, 88 L.Ed.2d 70 (1985); Patterson v. Crabb, 904 F.2d 1179, 1180 (7th Cir.1990). See also 2d Cir.R. 27(c). However, this power is to be ‘exercised sparingly,’ Greater Boston Television Corp. v. FCC, 463 F.2d 268, 277 (D.C.Cir.1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972), and reserved for ‘exceptional circumstances.’ Fine, 758 F.2d at 53.”
*839 Sargent, supra, 75 F.3d at 89; see also Aerojet-General Corp. v. American Arbitration Ass’n, 478 F.2d 248, 254 n. 6 (9th Cir.1973) (noting that “the better view is that [the ‘term’] limitation was removed by the abolition of the ‘term’ concept in 1948, the lapse of time being significant only with respect to the court’s duty to ‘prevent injustice’ ” (quoting Greater Boston, supra, 463 F.2d at 275-76)).
Furthermore, the cases relying on the “term” rule do not address the situation where, as here, the underlying litigation is still pending before the trial court when recall is considered. The still pending nature of the underlying action — while perhaps not determinative by itself, see Sargent, supra, 75 F.3d at 91 (stating that “[e]ven if litigation of an action is ongoing, the reopening of previously dismissed claims is thus not lightly contemplated”)— must factor into any decision to recall a judgment. For example, in Maryland Casualty Co. v. Hallatt, 326 F.2d 275 (5th Cir.1964), the United States Court of Appeals for the Fifth Circuit considered of great importance the fact that underlying litigation had not terminated when it decided to recall and correct a judgment it had issued almost three years earlier:
“As a general rule, the decision of an appellate court in a case establishes the law of the case, not only for trial upon remand, but also for the appellate court itself upon subsequent review. But this rule is not an inexorable command, and must not be used to accomplish an obvious injustice. We recognize that an appellate court’s power to depart from its own ruling on a former appeal should be exercised sparingly and only in exceptional cases. This is an exceptional case. The litigation has not yet terminated. The initial error was our misapplication of governing state law. That error is revealed by an intervening clear enunciation emanating from a Florida Appellate Court.
“This Court has jurisdiction of and will correct an initial opinion where as here, between the date of the initial decision and the time we are again called upon to pass upon the same case, a controlling state court has made a decision that we were ‘dead wrong.’ The Florida Court in Barnes[ v. Threshermen & Farmers’ Mut. Cas. Ins. Co., 146 So.2d 119 (Fla.Dist.Ct.App.1962)] has saved us from committing a miscarriage of justice. We are not insensible to possible complications but are of the opinion that under the total circumstances it is our duty to conform our decision to the supervening decision of the State Court, such decision being under Erie [R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)] the right decision.
[[Image here]]
“Accordingly, we now grant the petition for rehearing in Civil Action 18485, vacate our initial opinion and order therein, and affirm the judgment of the District Court rendered on June 17, 1960.”
Hallatt, 326 F.2d at 276-77 (footnote omitted; emphasis added).
The fact that limitations on this inherent appellate power have been based upon pragmatic concerns does not necessarily invalidate or disparage the wisdom of applying much restraint to the use of this power. However, given that no particular time limitations are constitutionally mandated, the exercise of this power falls within this Court’s discretion. I do not believe that it is necessary, at this point, to delineate specific standards for the use of that discretion in all cases, because I find it beyond dispute that our June 29, 2001, recall of the case then pending on remand in James — which had Justice Johnstone’s *840 vote and approval (see the appendix to this special writing) — was appropriate. I earnestly believe that recalling our remand in this case — a still pending, and without doubt, sui generis case involving extremely important issues of constitutional integrity (which this Court, as explained above, has a special duty to protect) in order to examine fundamental separation-of-powers and other jurisdictional concerns — is certainly within our power. See Ala.Code 1975, § 12-2-13.
APPENDIX to Justice Houston’s Special Writing
IN THE SUPREME COURT OF ALABAMA
June 29, 2001
1950030
Ex parte Governor Fob James et al. (In re: Alabama Coalition for Equity, Inc., an Alabama nonprofit corporation, et al. v. Fob James, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.)
1950031
Ex parte Governor Fob James et al. (In re: Mary Harper, suing as next friend of Deion Harper; and Kerry Phillips, a minor, et al. v. Fob James, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al.)
1950240
Fob James, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al. v. Alabama Coalition for Equity, Inc., et al.
1950241
Fob James, Jr., in his official capacity as Governor of the State of Alabama and as president of the State Board of Education, et al. v. Mary Harper et al.
1950408
Joyce Pinto et al. v. Alabama Coalition for Equity et al.
1950409
Joyce Pinto et al. v. Alabama Coalition for Equity et al.

ORDER

On December 3, 1997, we remanded cases 1950030, 1950031, 1950240, 1950241, 1950408, and 1950409 to the trial court with directions that that court retain jurisdiction. In order that the question of this Court’s subject-matter jurisdiction over those cases may be addressed, that remand order is ex mero motu vacated to the limited extent of requiring the parties to present briefs directed to the issue whether the order in the liability phase entered on March 31, 1993, declaring that Alabama’s public education system violated “Ala. Const, art. I, §§ 1, 6, 13, and 22 ... and art. XIV, § 256 ...” was a final, ap-pealable order.
All parties are given 28 days from the date of this order, to file briefs addressing this limited issue.
This the 29th day of June 2001.
MOORE, C.J., and HOUSTON, SEE, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
LYONS, J., recuses himself.
[END OF APPENDIX.]

. See Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 901-10 (Ala.1995).

. See Ex parte James, supra, at 894-95.

. I have written, in a passionate but not scholarly article, and I believe, that “Alabama needs a new constitution!” J. Gorman Houston, Jr., A Justice Looks at a Constitution, 30 Cumb. L.Rev. 1 (1999-2000). However, until there is a new Constitution, I will support the 1901 Constitution and its myriad amendments.

. Ala. Const.1901, Preamble (“We, the people of the State of Alabama , do ordain and establish the following Constitution ... for the State of Alabama.... ”).

. "[T]he judicial [department] shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.” Ala. Const.1901, § 43.

. In Shuttlesworth v. Birmingham Board of Education, supra, 162 F.Supp. at 379-80, the United States District Court for the Northern District of Alabama described how Amendment 111 provided the Legislature with the ability (previously unavailable under the original § 256) to repeal segregation laws:
“Section 256 of the Alabama Constitution of 1901 had provided in part: 'Separate schools shall be provided for white and colored children, and no child of either race shall be permitted to attend a school of the other race.’ The Amendment eliminating that provision [Amendment 111], having been submitted by the Legislature, was adopted by the people on August 28, 1956. After the adoption of that amendment, the 1955 School Placement Law, Acts 1955, p. 492, was amended to implement the amended Constitutional provision by repealing various statutes which had required the maintenance of separate schools for the races. Acts 1957, p. 482.”
(Footnote omitted.)

. The only way this language could even begin to approach a demonstrable "injury” to the plaintiffs is by a theory of "sin by omission,” i.e., that the Amendment removes a fundamental right to education that is required to be recognized. However, (1) such a right could be “required to be recognized” only if required by the United States Constitution, which contains no such right, see Rodriguez, supra, and (2) even if the right did exist in the federal constitution, conflicts with federal constitutional guarantees serve only to nullify the application of conflicting state con *827 stitutional provisions, and not to copy federal guarantees into state constitutions. See Petuskey v. Clyde, 234 F.Supp. 960, 963-64 (D.Utah 1964) (noting that conflicts with the guarantees of the United States Constitution render portions of state constitutions "totally void in application”).

. See Norwood v. Harrison, 413 U.S. 455, 461-63, 469, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) (acknowledging its prior holding in Pierce v. Society of the Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), that parents had a right “to provide an equivalent education for their children in a privately operated school of the parents’ choice,” and stating that while private, racially segregated schools can enjoy no direct state support, "[sjuch private bias is not barred by the Constitution”); see also School Dist. of Abington Township v. Schempp, 374 U.S. 203, 242, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring) ("Attendance at the public schools has never been compulsory; parents remain morally and constitutionally free to choose the academic environment in which they wish their children to be educated.”). The Supreme Court has never held private, racially segregated schools to be unconstitutional. In 1976 the Court did hold that the maintenance of private, racially segregated schools was prohibited by 42 U.S.C. § 1981, a federal civil rights statute that prohibits the denial, on the basis of race, of the ability to make and enforce contracts. Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). However, at the time that Amendment 111 was proposed and ratified, § 1981 applied only to bar “discrimina-tions imposed by state law.” Runyon, 427 U.S. at 192, 96 S.Ct. 2586 (White, J., dissenting).

. An example of an educational policy promulgated while Amendment 111 was in effect and that was challenged as being unconstitutional under the Equal Protection Clause is found in Shuttlesworth, supra, in which a three-judge federal panel upheld the Alabama School Placement Law against a constitutional challenge. This holding was then affirmed by the United States Supreme Court.

. It is beyond dispute that an improper purpose alone does not equal injury. The United States Supreme Court has clearly and unequivocally stated that in order to establish a violation of the Equal Protection Clause, both improper purpose and injury — two distinct elements — must be shown. Hunter v. Underwood, 471 U.S. 222, 227-28, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) ("[Ojfficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. ... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.” (quoting Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and citing Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976))); see also Coleman v. Miller, 117 F.3d 527, 529-31 (11th Cir.1997) (holding that the display of the Confederate flag over state office buildings did not violate the plaintiff’s rights under the Equal Protection Clause, because the plaintiff could not demonstrate discriminatory "impact,” and therefore did not satisfy the "two-pronged” test discussed in Hunter), Shuttlesworth, supra, 162 F.Supp. at 381 (stating that "[i]f ... we could assume that the [Alabama School Placement Law] was passed by the legislature with an evil and unconstitutional intent, even that would not suffice” to hold the School Placement Law unconstitutional).

. I note that a perfect example of the use of the amendment procedure by those with concerns similar to the plaintiffs is Senate Bill 336, a proposed constitutional amendment submitted on January 31, 2002, by Senator Hank Sanders; Senate Bill 336 reads as follows:
"A BILL
"TO BE ENTITLED “AN ACT
"Proposing an amendment to the Constitution of Alabama of 1901, to provide for a revised Section 256 of Article XIV as amended by Amendment 111 of the Constitution of Alabama of 1901 to require the Legislature to establish, organize, and maintain a system of public schools which provides equitable and adequate educational opportunities to all schoolchildren.
"BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:
"Section 1. The following amendment to the Constitution of Alabama of 1901, as amended, is proposed and shall become valid as a part thereof when approved by a majority of the qualified electors voting thereon and in accordance with Sections 284, 285, and 287 of the Constitution of Alabama of 1901, as amended:
"PROPOSED AMENDMENT
"Section 256 of Article XIV as amended by Amendment 111 of the Constitution of Alabama of 1901, is repealed and the following Section 256 is adopted:
"Section 256. Duty of Legislature to establish and maintain public school system.
"The Legislature shall establish, organize, and maintain a system of public schools throughout the state which provides equitable and adequate educational opportunities for all schoolchildren in kindergarten through high school.
"Section 2. An election upon the proposed amendment shall be held in accordance with Sections 284 and 285 of the Constitution of Alabama of 1901, as amended, and the election laws of this state.
"Section 3. The appropriate election official shall assign a ballot number for the proposed constitutional amendment on the election ballot and shall set forth the following description of the substance or subject matter of the proposed constitutional amendment:
" 'Proposing an amendment to the Constitution of Alabama of 1901, to provide for a revised Section 256 of Article XIV relating to the duty of the Legislature to establish, *830 organize, and maintain a system of public schools which provides equitable and adequate educational opportunities for all schoolchildren. Proposed by Act-

. See supra, note 16, discussing the test applied when analyzing the validity of a law under the Equal Protection Clause of the Fourteenth Amendment.

.After reviewing the briefs submitted in accordance with our June 29, 2001, order, important considerations that had never before been previously addressed arose relating to issues fundamental to the trial court's ability to make the March 31, 1993, order final. Accordingly, on January 10, 2002, five members of this Court, in accordance with the Court's internal rules, ex mero motu placed on rehearing Ex parte James, supra, and Pinto v. Alabama Coalition for Equity, 662 So.2d 894 (Ala.1995) (another decision stemming from the Equity Funding Case), and directed the parties to address certain additional concerns, including the trial court's subject-matter jurisdiction. However, after further consideration pursuant to our June 29, 2001, order, we determined that placing these cases on rehearing was not necessary.

. See Ex parte James, 713 So.2d at 895-920 (Hooper, C.J., dissenting) (describing some of the troublesome aspects of the procedural posture of the Equity Funding Case).

. In other words, this power has been instilled in us by the citizens of the State of Alabama.

. This Court’s supervisory authority has been constitutionally recognized throughout the history of this State. See Ala. Const. 1819, art. V, § 2 (,"[T]he supreme court shall have power to issue writs of injunction, mandamus, quo-warranto, habeas corpus, and such other remedial and original writs, as may be necessary to give it a general superintendence and control of inferior jurisdiction.”); Ala. Const. 1861, art. V, § 2 ("general superintendence and control of inferior jurisdiction”); Ala. Const. 1865, art. VI, § 2 ("general superintendence and control of inferior jurisdictions”); Ala. Const. 1868, art. VI, § 2 (“general superintendence and control of inférior jurisdiction”); Ala. Const. 1875, art. VI, § 2 ("general superintendence and control of inferior jurisdictions”); Ala. Const.1901, art. VI, § 140 ("general superintendence and control of inferior jurisdictions”).

. The Florida courts do not always insist on a strict application of the rule. See Peter v. Seapine Corp., 678 So.2d 508, 509 (Fla.Dist.Ct.App.1996) (discussing the court’s jurisdiction to recall a mandate after the term expires, so long as the motion to recall has been filed before the term expires).